**In the Matter of MORRIS PAINT AND VARNISH COMPANY, Debtor-Appellant.**

No. 84–2884.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1985.
Decided Sept. 5, 1985.

Russell V. Sutton, Sutton & Gunn, Chicago, Ill., for appellant.

Ronald L. Pallmann, McRoberts, Sheppard, Wimmer & Pallmann, East St. Louis, Ill., for appellee.

Before WOOD and CUDAHY, Circuit Judges, and WRIGHT, Senior Circuit Judge.*

I.

CUDAHY, Circuit Judge.

In November 1979, appellant Morris Paint & Varnish Company ("Morris") borrowed $285,000 from appellee, MidAmerica Bank & Trust Company of Edgemont ("the Bank"). This ten-year loan was guaranteed by the Small Business Administration, and was also secured by a mortgage on Morris' business property. The mortgage agreement required Morris to obtain a fire insurance policy on the property, with a company and in an amount satisfactory to the Bank, which would name the Bank as the loss payee of the policy. In addition, the agreement provided that in the event of loss, the Bank had the right to elect either to apply the insurance proceeds to reduce the loan or to repair and restore the premises.

Morris did obtain a policy which met the terms of the mortgage agreement. In March 1982, a fire occurred that destroyed substantial portions of the building as well as inventory. Business was interrupted for the next eight months and during this period Morris failed to make the payments due on the mortgage. The Bank loaned Morris an additional $50,000 to cover expenses relating to securing the property and the inventory, and this loan was secured by an assignment to the Bank of $50,000 from the proceeds of the insurance policy payable for inventory loss. The inventory loss was paid by the insurance carrier in September 1982, and the $50,000 loan was repaid.

On October 19, 1982, the Bank and Morris signed a Mortgage Extension Agreement, which was subsequently amended on November 5, 1982. This agreement provided for the extension of the $285,000 note, with the arrearage to be paid in a single lump sum and the interest rate increased.

The extension agreement expressly stated that none of the other terms of the note or mortgage were amended. Thereafter, the insurance carrier settled the remaining claims for loss to the building and business interruption, and on November 15, 1985, issued two drafts payable jointly to Morris and to the Bank, for a total of $692,859.13. These funds were deposited in an account at the Bank.

On December 1, 1982, Morris submitted to the Bank fiscal projections for 1983, including projections for its intended use of the insurance proceeds. Morris also made payments due under the renegotiated loan. On December 14, 1982, the Bank called Morris' loan, demanding payment within two weeks. When payment was not made, the Bank satisfied the loan by transferring funds out of Morris' account on February 3, 1983. On March 16, 1983, Morris filed a voluntary petition in bankruptcy under Chapter 11.

Morris then filed a complaint against MidAmerica to begin an adversary proceeding in the reorganization case under Chapter 11, attacking under various theories the Bank's withdrawal of funds from its account to satisfy the note. The Bank responded that under the terms of the mortgage agreement it had the right to elect to apply the insurance proceeds to the balance due on the note. The Bank moved for summary judgment, the parties submitted various affidavits, and thereafter the bankruptcy court granted summary judgment in favor of MidAmerica. It held that under the mortgage agreement the Bank had the right to apply the insurance proceeds to pay off the outstanding balance on the note, and that Morris was inappropriately attempting through its affidavits to use parol evidence to modify the terms of the mortgage agreement. The bankruptcy court did not consider the effect of the Mortgage Extension Agreement because it believed (erroneously) that the Bank had not signed it.

* The Honorable Eugene A. Wright, Senior Circuit Judge for the Ninth Circuit, is sitting by designation.

Morris appealed the bankruptcy court decision to the district court, which affirmed the grant of summary judgment in the Bank's favor, finding that Morris had failed to show any genuine issue of material fact relating to the Bank's right to apply the funds to pay off the note under the terms of the mortgage agreement. *Morris Paint & Varnish Company v. MidAmerica Bank & Trust Company of Edgemont,* No. 84–5089, (S.D.Ill. June 20, 1984). Morris then moved for reconsideration, arguing that Morris and the Bank had orally agreed that the insurance proceeds would be used to rebuild Morris' facilities, which understanding modified the written mortgage agreement. Morris also contended that the Bank's promises and conduct to that effect estopped it from applying the insurance proceeds to satisfy the debt. The district court denied Morris' motion. It held that any oral agreement that might have been made could not modify the written contract because the oral agreement would violate the statute of frauds (a proposition which the parties agree is incorrect as applied to the circumstances of this case). It also found no evidence that Morris had detrimentally relied on the alleged oral agreement so as to be able to invoke the doctrine of promissory estoppel. *Morris Paint & Varnish Company v. MidAmerica Bank & Trust Company of Edgemont,* No. 84–5089 (S.D.Ill. October 1, 1984). Morris appealed and we affirm.

## II.

The section of the mortgage agreement which is central to resolution of this case provides:

> In the event of loss, mortgagor will give immediate notice in writing to mortgagee, and mortgagee may make proof of loss if not made promptly by mortgagor, and each insurance company concerned is hereby authorized and directed to make payment for such loss directly to mortgagee instead of mortgagor and mortgagee jointly, and *the insurance proceeds, or any part thereof, may be applied by the mortgagee at its option either to the reduction of the indebtedness hereby secured or to the restoration and repair of the property damaged or destroyed.* (Emphasis added.)

The emphasized portion of this provision without question gives the Bank the right to apply the insurance proceeds to the balance due on the note. Morris' claim that the Bank should not have applied the proceeds in that way stems from alleged oral statements by Bank representatives, and other Bank conduct, indicating the Bank's intention not to elect this option but rather to apply the proceeds to restoration and repair of the property. Morris contends that by making these statements, the Bank effectively made an election to rebuild, thereby a) waiving its contractual right to apply the proceeds to reduce the indebtedness, b) modifying the contract to eliminate that right and/or c) irrevocably fixing its obligation to apply the proceeds toward rebuilding.

■ Although these arguments rest on somewhat different premises, we think we need not discuss the intricacies of the parties' contentions on these points separately, since each of Morris' theories that we have noted fails for the same reason. All of the Bank's statements allegedly were made between the time of the fire, when the mortgage agreement was fully in effect, and November 5, when the Mortgage Extension Agreement came into force. The original Mortgage Extension Agreement, dated October 19, 1982, extended the note, with changes in interest rate, and the amount and beginning date of the monthly payments, "providing all other conditions remain in full force and effect." That Mortgage Extension Agreement was further amended by a document entitled "Agreement Entered Into By The Maker And The Holder of the Within Described Note," dated November 5, 1982, which also recited changes in payments and interest rate, and then stated "provided however, that the note (including particularly but without limitation, the rights and remedies of the holder thereof in the event of breach or default) hereinabove described shall not be

deemed or construed to be amended or modified except to the extent and in the manner expressly set forth herein." [1]

The Mortgage Extension Agreement says absolutely nothing about any agreement that the insurance proceeds would be used to rebuild. To the contrary, the extension agreement incorporates by reference the insurance provision in the original mortgage agreement, which clearly gave the Bank the right to elect to apply the proceeds to the balance due on the note. Indeed, the extension agreement explicitly states that the note was not to be deemed or construed to be amended or modified in any respect other than as the mortgage extension amendments provided. "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." 3 Corbin, *Contracts,* § 573 (1963). Since all of the Bank's alleged actions indicating its intent to apply the proceeds toward rebuilding occurred prior to the execution of the Mortgage Extension Agreement on November 5, 1982, evidence of these actions to contradict the explicit and unambiguous terms of that agreement is barred by the parol evidence rule. *See, e.g., 20 East Cedar Condominum Association v. Luster,* 39 Ill. App.3d 532, 535, 349 N.E.2d 586, 589 (1976).

Morris also makes a slightly different argument to support its claim that the Mortgage Extension Agreement does not allow the Bank to use the insurance proceeds as it did. Morris contends that the doctrine of merger applies so that the original contract (the mortgage agreement) merged into the subsequent contract (the Mortgage Extension Agreement) and there-

fore the rights and duties of the parties are determined solely by the subsequent Mortgage Extension Agreement. *See Kraft v. No. 2 Galesburg Crown Finance Corporation,* 95 Ill.App.3d 1044, 1049–50, 51 Ill. Dec. 451, 456, 420 N.E.2d 865, 870 (1981). Thus, Morris contends that "the Defendant's right to use the insurance proceeds to satisfy the debt under the November 1979 agreement was extinguished upon execution of the November 1982 [Mortgage Extension Agreement, which] was tantamount to a new loan, the purpose of which was [to] rebuild plaintiff's facilities. Of course, the funds for this loan were to have come from the insurance proceeds as defendant has promised." Morris' Br. at 27. In essence, Morris is contending that once the Mortgage Extension Agreement became effective, the Bank no longer had the right under the original agreement to use the proceeds from the fire loss to pay off Morris' debt. Morris' argument continues that, even though the insurance proceeds provision is incorporated by reference in the extension agreement, that provision would only become operable were *another* fire to occur after November 5, 1982. In that event the Bank would acquire the option to use any insurance proceeds from that fire to satisfy the debt. Assuming for the sake of argument that the doctrine of merger is applicable here, Morris' argument is nevertheless unsound. The extension agreement, which admittedly governs, explicitly incorporates the unambiguous insurance provision giving the Bank the right to elect how to use the proceeds. Morris' strained argument that this provision should be read only to apply to proceeds from future fire losses—a view finding no support in the language of the agreement—depends again on parol evidence of the Bank's alleged statements and actions prior to execution of the extension agreement. And

---

1. As noted, the courts below failed to consider the effect of the Mortgage Extension Agreement, apparently because of the bankruptcy court's erroneous assumption that the extension agreement had not been signed by the Bank. Since

neither of the parties dispute the validity or effectiveness of the extension agreement (indeed, both rely on it), we do not consider this issue further.

this may not be admitted to vary the terms of the writing.[2]

## III.

■ Morris' most persuasive contention is that, even if the Bank's statements may not be admitted to contradict the terms of the mortgage extension agreement, the Bank's actions nevertheless should, under the doctrine of promissory estoppel, prevent it from using the insurance proceeds to satisfy the debt. This is asserted to be the case because Morris relied to its detriment on the Bank's assurances that it would apply the proceeds for rebuilding. The doctrine of promissory estoppel may be invoked where "(1) there is a promise which is unambiguous in its terms; (2) there is reliance by the party to whom the promise is made; (3) the reliance is expected and forseeable by the party making the promise; and (4) the party to whom the promise is made relies upon the promise to his detriment." *Dale v. Groebe & Company,* 103 Ill.App.3d 649, 653, 59 Ill.Dec. 350, 354, 431 N.E.2d 1107, 1111 (1981). The courts below found that there was no evidence that Morris had detrimentally relied on the Bank's alleged promises. (We assume for purposes of this discussion that the other elements necessary for promissory estoppel could be demonstrated).

Morris contends on appeal that it relied to its detriment when it: a) allowed the Bank to use most of the funds from the insurance proceeds for the $250,000 inventory loss to pay its inventory debt; b) borrowed $50,000 from the Bank to make repairs and initiate rebuilding efforts; c) repeatedly submitted rebuilding plans to the Bank; d) agreed to a higher interest rate and made payments pursuant to the Mortgage Extension Agreement; and e) settled its insurance claim for damage to its facilities for about $942,000 when the insurance policy was in the face amount of $1,360,000.[3]

■ In reviewing a lower court's decision to grant summary judgment, an appellate court should consider only the evidence that was before the trial court. Arguments and factual assertions made by counsel in a brief, unsupported by affidavits, cannot be given any weight. *See S.A. Empresa v. Walker Kidde & Co., Inc.,* 690 F.2d 1235, 1238 and n. 5 (9th Cir.1982); *Garza v. Chicago Health Clubs, Inc.,* 347 F.Supp. 955, 964 (N.D.Ill.1972). Most of Morris' assertions regarding the ways in which it detrimentally relied on the Bank's conduct are not properly before us. The affidavit of Samuel Ferguson, President & Secretary-Treasurer of Morris, which Morris filed in opposition to the Bank's motion for summary judgment, says nothing whatever about the use of part of the insurance proceeds to pay off the $250,000 inventory debt, and nothing in the record shows the circumstances of this payment. While mention is made of the Mortgage Extension Agreement, the $50,000 loan and the submission of rebuilding plans, there is nothing to indicate that Morris would not have undertaken these activities but for its reliance on the Bank's alleged promises, or that these actions were detrimental to it. The only assertions in the affidavit relating to detrimental reliance, in paragraphs 5

---

**2.** We note incidentally that, even if the parol evidence was considered, it is highly doubtful that Morris could succeed on its waiver, modification or irrevocable election theories. The insurance proceeds at issue were not received until about November 15, 1982, so the Bank could not actually have "applied" the proceeds to reduce the debt or restore the property until that date. Thus, it appears to us that actions by the Bank allegedly evidencing its intention to apply the proceeds in one fashion or another prior to its receipt of the insurance checks should at most be construed as promises that it would apply the proceeds toward rebuilding rather than as an ultimate choice or commitment to do so. Therefore, independent of the application of the parol evidence rule, we believe Morris' contentions are more appropriately considered under the doctrine of promissory estoppel than under theories of waiver and the like.

**3.** With respect to the face amount of the policy, Morris' affidavit and other materials indicate its belief that $1,360,000 was the total policy amount, but a copy of the policy attached as an exhibit in the record indicates that the total policy amount was only $1,275,000. We have been furnished no explanation of this discrepancy.

and 10 of the affidavit, state that Morris settled its fire loss claim for the sum of $942,000 "in order to obtain an expeditious settlement and commence rebuilding its plant to resume manufacturing activities" and that Morris would not have settled the claim for "less than the amount of its actual loss" (which is alleged to be greater than $1,360,000) were it not for its reliance on the Bank's "election" to allow Morris to use the proceeds to rebuild its plant.

The Bank, on the other hand, argues that a letter from Morris to the Bank dated December 1, 1982, as well as the financial plan submitted to the Bank, indicate that Morris intended to use only about $125,000 of the insurance proceeds toward rebuilding (or, rather, toward modifying its existing warehouse so it could be used for manufacturing), while the bulk of the remainder of the non-inventory proceeds were to be used to pay other creditors. Thus, the Bank argues, Morris could not have detrimentally relied on the Bank's promise to apply the proceeds toward rebuilding since Morris never really intended to rebuild, or at least did not settle its claim to achieve this objective. We note, however, that the letter and financial plan were apparently submitted after the settlement had occurred in October 1982, so Morris' projected use of the funds in December may or may not be dispositive with respect to the issue of its intentions or plans at the time it settled the claim.[4]

Nevertheless, we believe that the allegations in Morris' affidavit are so conclusory, and so devoid of specific factual content, that they are insufficient to create a material issue of fact regarding detrimental reliance. Morris first alleges that it settled its claim with the insurance company for a lower figure than it otherwise would have "in order to obtain an expeditious settlement and commence rebuilding." No facts are given to explain Morris' need to expedite rebuilding, or to show how its rebuilding plans would have been affected if the Bank had not made the representations alleged. (Nor do we even know whether the plant was in fact ever rebuilt.) Since the insurance settlement was far greater than the amount necessary to pay off the mortgage with the Bank, we presume that Morris might have attempted to rebuild even if the Bank had told Morris all along that it would apply part of the insurance funds to satisfy the debt. In such a case Morris' need for an expeditious settlement might well have been greater than under the circumstances alleged here. Alternatively, if Morris would not have been able to rebuild but for the Bank's application of the insurance proceeds toward that end, then we do not see how Morris' position was worsened merely by the Bank's eventual decision not to do so. Put somewhat differently, the fact that Morris might have benefited from the Bank's decision to use the insurance proceeds to rebuild does not necessarily lead to the conclusion that it suffered any detriment because the Bank failed to confer that benefit. Morris must show that it detrimentally *changed its position* with respect to rebuilding in reliance on the Bank's statements, but it has stated no facts pertaining to its rebuilding plans or activities.

Morris does allege that it would not have settled its claim for "less than the amount of its actual loss," but this statement is also quite conclusory. Although Morris claims that its actual loss was in excess of $1,360,000, it does not state what the amount of its "actual loss" was, nor how it determined that its actual loss was greater than the amount of the settlement. For all we know this is merely the personal opinion of the Secretary-Treasurer of the Company. *Cf. Ashwell & Company v. Transamerica Insurance Co.,* 407 F.2d 762, 766 (7th Cir.1969) (statement not affirmatively shown to be within affiant's personal knowledge properly disregarded for sum-

---

**4.** At least portions of the plan may have been prepared prior to settlement of the amount payable for loss to the building. A page of the plan related to insurance proceeds lists $550,000 as the "Amount Offered" (apparently by the insurance company) in settlement for loss to the building, and $700,000 as the "Amount Desired" (apparently by Morris). No figure is shown for loss to the building under the column entitled "Amount Received/Accepted."

mary judgment purposes). Significantly, we also have not been told what proportion of the "actual loss" was attributable to the building, rather than to inventory or business interruption, nor what proportion of the settlement represents compensation for damage to the building, rather than other items.[5] Therefore, there is no basis for comparing Morris' view of the "actual loss" to the property to the amount it actually received for that loss in the settlement. More important, nothing in the affidavit indicates how the *Bank's* decision (or lack of one) about applying part of the insurance proceeds affected the amount of the settlement between Morris and the insurance company. Morris may well have wanted to receive more money, but no facts are offered to show on what basis it believed it would actually have been able to obtain more (for example, it seems unlikely that Morris would have been able to recover its "actual loss" where that amount is alleged to be greater than the face amount of the policy). In the absence of specific supporting facts, Morris' statement that it would not have settled for less than its actual loss but for the Bank's actions appears to be mere speculation.

As the preceding discussion indicates, Morris has not met its obligation under FED.R.CIV.PRO. 56(e) to "set forth specific facts showing that there is a genuine issue for trial." *See, e.g., United States v. Ehrlich,* 643 F.2d 634, 636–37 (9th Cir.), *cert. denied,* 454 U.S. 940, 102 S.Ct. 474, 70 L.Ed.2d 247 (1981) (allegation that certain building costs were $70,000 more than agency's calculation too conclusory to defeat summary judgment where no specification of omitted or understated items offered); *Ashwell & Company v. Transamerica Insurance Co.,* 407 F.2d at 765–66 (allegation that insurer intended to issue and plaintiff intended to receive particular type of policy merely conclusory and should not be considered). Morris does not have to try its case by affidavit, but it must state some facts from which it can be in-

ferred that it would be able to provide evidence at trial to support its theory. Because its conclusory assertions are insufficient to raise a genuine issue of material fact, we affirm the district court's grant of summary judgment for the Bank.

---

5. Morris' brief states that the proportion of the settlement representing losses to its real property was about $692,000, although there is nothing in the affidavit to this effect. A letter from Morris to the Bank dated December 1, 1982 apparently refers to the amount of proceeds expected for damage to property as $642,859.00.