Marta NIEVES, in Representation and
on Behalf of her minor son Angel Luis
Hernandez Nieves, Plaintiff, Appellant,

v.

UNIVERSITY OF PUERTO RICO,
et al., Defendants, Appellees.

No. 92–2214.

United States Court of Appeals,
First Circuit.

Heard Aug. 2, 1993.
Decided Oct. 18, 1993.

David Efron with whom Law Offices of David Efron, was on brief, for plaintiff, appellant.

Efren T. Irizarry–Colon with whom Elisa M. Figueroa–Baez, was on brief, for defendants, appellees.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Marta Nieves appeals a district court order dismissing the medical malpractice action she brought in behalf of her minor son Angel Luis Hernández Nieves against Angel Gelpí,

M.D., and González Recio, M.D., whom the district court found immune from suit pursuant to P.R.Laws Ann. tit. 26, § 4105. We affirm.

# I

## BACKGROUND

We recite the facts in the light most favorable to plaintiff. *See Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.*, 982 F.2d 686, 689 (1st Cir.1993) (summary judgment). In December 1983, Marta Nieves entered the Federico Trilla Hospital ("the Hospital"), a privately owned and operated medical facility in Puerto Rico. Appellee Angel Gelpí and Jose Meléndez, medical residents under the supervision of the attending physician, Dr. Ailed González Recio, undertook the delivery of Nieves' son Angel. The three physicians were affiliated with the University of Puerto Rico Medical School ("UPR"). Later, Angel was diagnosed with serious physical and mental impairments, allegedly attributable to asphyxiation during childbirth.

In December 1990, Nieves, by that time a resident of Florida, brought this diversity action against, *inter alia*, UPR, Drs. Gelpí and González Recio, and their insurers, alleging professional negligence. *See* P.R.Laws Ann. tit. 31, §§ 5141–5142.[1] Defendants answered and moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). UPR, noting its status as an "arm" of the Commonwealth of Puerto Rico, asserted its Eleventh Amendment immunity from unconsented suit, *see Perez v. Rodriguez Bou*, 575 F.2d 21, 25 (1st Cir.1978), and its insusceptibility to federal diversity jurisdiction, *see Moor v. County of Alameda*, 411 U.S. 693, 717, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973).

▮ The two appellees, who claimed to be UPR "employees," hence physicians employed by the Commonwealth, relied on P.R.Laws Ann. tit. 26, § 4105 (Supp.1989) as a basis for dismissal:

---

1. The original complaint also named Dr. Fernández, the admitting physician, and Dr. Meléndez, but Nieves dismissed as to Fernández and failed to serve Meléndez.

No health service professional may be included as a defendant in a civil suit for damages due to malpractice caused in performance of his profession while said health service professional acts in compliance with his duties and functions as an employee of the Commonwealth of Puerto Rico, its dependencies, instrumentalities and municipalities.

*Id.* Section 4105, a provision of Act No. 74 of 1976, otherwise known as the Medico–Hospital Professional Liability Insurance Act (MHPLIA), was enacted to alleviate the severe malpractice insurance crisis facing Puerto Rico. *See generally Enriquez Pérez v. Fernández,* 108 P.R. Dec. 674, 677–80 (1979). The appellee doctors contend that any patient injured by the professional negligence of a physician covered by section 4105 has legal recourse only against the physician's employer, or the Commonwealth, which is immune from compensatory damages liability in excess of $75,000, *see* P.R.Laws Ann. tit. 32, § 3077(a), and, in any event, not amenable to suit in federal court.[2]

On January 31, 1992, following eight months of discovery, Nieves filed her opposition to the motion to dismiss. Nieves contended that section 4105 violated the Equal Protection Clause and the Due Process Clause of the United States Constitution and their counterpart clauses in the Puerto Rico Constitution. Alternatively, Nieves argued that there remained a genuine issue of material fact with respect to whether Drs. Gelpí and González Recio were UPR "employees" entitled to section 4105 immunity, or merely "independent contractors" employed pursuant to a contract between the Hospital and UPR.

On the same day that Nieves filed her opposition to the motion to dismiss, the district court dismissed the complaint as to all defendants.[3] Three weeks later, however, the two appellee physicians filed a "reply" to Nieves' opposition, to which they attached a sworn statement by a UPR dean attesting that Dr. González Recio was an "employee" of the UPR medical school campus in December 1983, and that Dr. Gelpí was a "resident" in the UPR medical graduate program. On April 7, 1992, Nieves filed a motion for clarification and reconsideration, expressing concern that the district court overlooked the arguments presented in the opposition memorandum she filed the day the court dismissed the complaint. The district court denied the motion to reconsider.

## II

## DISCUSSION

### A. *Constitutionality of Section 4105.*

Nieves contends that section 4105 violates the equal protection and due process clauses of the Puerto Rico Constitution[4] because it (1) discriminates against "poor" people—an inherently "suspect" class under Puerto Rico constitutional law—who have no economic option but to use the low-cost public health services provided by physicians employed by the Commonwealth, or (2) divests all patients treated by Commonwealth-employed physicians of a "fundamental" constitutional right; that is, the right to recover *full* compensato-

---

2. Insurers are insulated from liability to the same extent their insured physicians are entitled to § 4105 immunity. *See Lind Rodríguez v. Commonwealth of Puerto Rico,* 112 P.R. Dec. 67, 68 (1982) (§ 4105 immunity not a personal defense, but the "inexistence of a cause of action," so that "the insurer is not liable").

3. The district court granted Nieves' request for voluntary dismissal of the complaint against UPR for lack of jurisdiction. *See* Fed.R.Civ.P. 41(a)(2). A Rule 12(b)(1) dismissal would not bar suit against UPR in the Commonwealth courts. *See Costello v. United States,* 365 U.S. 265, 285, 81 S.Ct. 534, 545, 5 L.Ed.2d 551 (1961) (Rule 12(b)(1) dismissal not disposition on merits).

4. Article II, section 7, of the Commonwealth constitution provides: "The right to life, liberty and enjoyment of property is recognized as a fundamental right of man. The death penalty shall not exist. No person shall be deprived of his liberty or property without due process of law. No person in Puerto Rico shall be denied equal protection of the laws...." Article II, section 1, provides: "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas. Both the laws and the system of public education shall embody these principles of essential human equality."

ry damages for injuries caused by physician negligence.[5] Nieves argues, therefore, that her constitutional challenges require us to subject section 4105 to "strict scrutiny." She requests that the district court's interpretation of Puerto Rico law be set aside, or that these constitutional questions be certified to the Puerto Rico Supreme Court. *See* P.R.Laws Ann. tit. 4, App. I–A, Rule 27(a).[6]

■ Under Puerto Rico law, a statutory classification that "affects *fundamental rights* of the citizen or is intended against a *suspect classification*" is subjected to "strict scrutiny," a heightened standard under which the Commonwealth must demonstrate "a compelling state interest which justifies the classification and that the [classification] necessarily encourages the attainment of that interest." *Zachry Int'l of Puerto Rico v. Superior Court of Puerto Rico,* 104 P.R. Dec. 267, 277–78 (1975) (emphasis added). We have been unable to find a reported Puerto Rico decision squarely addressing the constitutional questions raised by Nieves. The cases cited by appellees, and presumably endorsed by the district court, are distinguish-

able, either because they involve statutory classifications which do not implicate the species of "fundamental right" or "suspect class" relied on by Nieves in the present case, *see, e.g., Lind Rodríquez v. Commonwealth of Puerto Rico,* 112 P.R. Dec. 67 (1982); *Vázquez Negrón v. Department of Health of Puerto Rico,* 109 P.R. Dec. 19 (1979),[7] or because they treat with arguments exclusively based on the United States Constitution, not the Commonwealth constitution, *see, e.g., Rodríquez Diaz v. Sierra Martínez,* 717 F.Supp. 27, 32 (D.P.R.1989) (presuming that *Lind* and *Vázquez* also determined § 4105's validity under the United States Constitution, undertaking its own independent inquiry of *federal* case law, and citing *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)); *supra* note 5.

■ Absent controlling state-law precedent, a federal court sitting in diversity has the discretion to certify a state-law question to the state's highest court. *See Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 1744, 40 L.Ed.2d 215 (1974). Before

---

5. On appeal, Nieves has abandoned the equal protection and due process arguments premised on the United States Constitution.

6. Rule 27 of the Supreme Court of Puerto Rico provides, in pertinent part:

   This court may take cognizance of any matter certified for it by the Supreme Court of the United States, a Circuit Court of Appeals of the United States, a District Court of the United States, ... whenever it is thus requested by any of said courts, if before the petitioner court there is any judicial matter involving questions of Puerto Rican law which may determine the result thereof, and with regard to which, in the opinion of the petitioner court, there are no clear precedents in the case law of this Court. P.R.Laws.Ann. tit. 4, App. I–A, Rule 27(a).

7. The district court cited these two decisions in its dismissal order. *Vázquez Negrón* reversed a summary judgment for a defendant-physician, finding that he was *not* covered by the pre–1978 version of § 4105, which excluded from its protection physicians who worked only part-time for the Commonwealth. *Vázquez Negrón,* 109 P.R. Dec. at 23. On appeal, plaintiff proposed an alternative basis for reversal, arguing that § 4105 violated his right to equal protection. Because the court found § 4105 inapplicable, however, it expressly refused to reach (or even to describe) plaintiff's constitutional argument. *Id.* at 25. On the other hand, the court reached, and reject-

ed, a distinct equal protection challenge raised by the *defendant-physician,* who contended that the pre–1978 version of § 4105 discriminated between physicians who worked exclusively for the Commonwealth and those who worked part-time. *Id.* at 25–26. Because part-time physicians are not a "suspect" class, and immunity from suit is not a "fundamental" constitutional right, *see Alicea v. Córdova Iturregui,* 117 P.R. Dec 676, 691 (1986) (noting that neither *Lind* nor *Vázquez* dealt with any fundamental right of physicians), the court upheld the statute on a traditional "rational basis" analysis. *Vázquez Negrón,* 109 P.R. Dec. at 25–26. ("[I]t is evident that those physicians whose income is limited to the salary derived from the State deserve greater protection.").

In *Lind Rodríguez,* the court affirmed summary judgment for a defendant-physician employed part-time by the Commonwealth, based on a 1978 amendment to § 4105 which eliminated its "exclusivity" limitation. *Lind Rodríguez,* 112 P.R. Dec. at 68. Despite plaintiffs' failure to preserve their equal protection claim in the trial court, the Puerto Rico Supreme Court considered and rejected the argument on its merits, adding that "[plaintiffs] do not persuade us to change our decision in *Vázquez Negrón." Id.* at 68–69. This cryptic language in *Lind Rodríguez* provides no guidance, however, as the court did not describe the equal protection claim it was rejecting.

this discretionary decision is even considered, however, we must first undertake our own prediction of state law for we may conclude that "the course [the] state court[ ] would take is reasonably clear." *Porter v. Nutter,* 913 F.2d 37, 41 n. 4 (1st Cir.1990); *cf. Salve Regina College v. Russell,* 499 U.S. 225, 239–40, 111 S.Ct. 1217, 1225, 113 L.Ed.2d 190, 203 (1991) (court of appeals erred by deferring to district court interpretation of local state law).

### 1. *Suspect Class Based on "Social Condition".*

■ The equal protection clause of the Puerto Rico Constitution, eclectically patterned on such works as the American Declaration of the Rights and Duties of Man and the Universal Declaration of the Rights of Man, is more liberally phrased than its federal counterpart. *See Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) (state constitution may afford more, but not less, protection than Federal Constitution). Specifically, Article II, section 1, of the Commonwealth constitution bans discrimination based on "social origin or condition." *See supra* note 4. The Puerto Rico Supreme Court has held that any statutory classification that discriminates on the basis of a "human dignity" standard enumerated in Article II, section 1, is inherently "suspect." *See, e.g., Léon Rosario v. Torres,* 109 P.R. Dec. 804, 813–14 (1980). Thus, although its precise contours remain undefined, "poverty" is considered a suspect classification under the Commonwealth constitution, triggering "strict scrutiny" analysis unobtainable under the Equal Protection Clause of the United States Constitution. *Compare, e.g., Molina v. Urban Renewal and Hous. Corp.,* 114 P.R. Dec. 295, 312 (1983) (summarizing history of Puerto Rico's constitutional convention, noting that "there can be no doubt that the drafters of our Constitution thought it was basic that there be no discrimination against any person by reason of the person's poverty ... and any classification based on this should be regarded with suspicion and be strictly scrutinized") (Irizarry, J., concurring), *with, e.g., Harris v. McRae,* 448 U.S. 297, 323, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980) ("[P]overty, standing alone, is not a suspect classification.").

■ Notwithstanding the unique history, culture and legal traditions of Puerto Rico, and the absence of a federal lodestar for a constitutional classification based on poverty, *see San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) (noting that, unlike race or gender, "the class of disadvantaged 'poor' cannot be identified or defined in customary equal protection terms"), we are confident that Nieves would not prevail on her claim under existing Commonwealth law. The claim falters on evidentiary grounds in that the summary judgment record is plainly deficient to enable a determination that the immunity scheme established by section 4105 *operates* to discriminate on the basis of a suspect classification.

Nieves does not contend that section 4105 discriminates—either on its face or as applied—against "poor" patients. Nor is it self-evident that patients utilizing public health services in Puerto Rico—a *facially* neutral statutory classification—are all, or even primarily, "poor." In addition, since section 4105 merely provides a "defense" which may be invoked by private civil litigants, *i.e.,* public health service doctors, against any patient allegedly injured as a result of medical malpractice by a public health service physician, Nieves cannot demonstrate that the Commonwealth has *applied* the statute selectively against only that subset of public health service patients who are "poor." Rather, Nieves' only colorable argument is that section 4105 has the actual *effect* of discriminating against "poor" people because a *disproportionate* share of public health services in Puerto Rico is administered to the "poor." Given this position, we think that Nieves' proposed showing would not establish unlawful discrimination under existing Puerto Rico judicial authority.

■ As a preliminary matter, we note that Nieves' claim of disparate impact rests on a fragile foundation. The data are presented

in the form of a lawyer's assertions,[8] rather than in the form required by Rule 56(e),[9] and are much less compelling and probative than Nieves' counsel claims.[10] Nonetheless, we assume, for present purposes only, that many of the users of Puerto Rico public health services are likely to be poorer than the average population. Still, we are not persuaded that the Puerto Rico courts would find that such a showing was a dispositive basis from which to declare section 4105 unconstitutional.

In addition to raw statistical data of disproportionate impact, we think the Commonwealth courts would require evidence (e.g., historical patterns of discrimination against the targeted class, or pre-enactment legislative history) that the Puerto Rico legislature enacted section 4105 with an invidious discriminatory purpose or intent against the "poor" as a class. Cf., e.g., Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 278–80, 99 S.Ct. 2282, 2295–97, 60 L.Ed.2d 870 (1979) (upholding gender-neutral state statute that gave civil service employment preference to "veterans," even though preferred class was proven to be 98% male, absent proof that Legislature enacted it "because of," rather than "in spite of" its adverse effects on women); Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (upholding testing for police officer applicants, despite statistical evidence that test had disproportionate adverse impact on black applicants, absent other evidence of "racially discriminatory purpose" of legislative enactment). Nieves proffered no such evidence of discriminatory purpose. In fact, section 4105's legislative history suggests that the Legislature was animated by far more beneficent motives—concern that inflationary malpractice insurance premiums would dry up the supply of physicians willing to practice in public health services, depriving many Puerto Rican families of quality health care. See generally Enriquez Pérez, 108 P.R. Dec. at 677–80.

---

**8.** Nieves' opposition memorandum, signed by her attorney David Efron, Esquire, recites the following data:

> Puerto Rico's per capita income is $18,705.00 according to the Planning Board's 1988 Report to the Governor. In that same year, the Medical Assistance Program of the Puerto Rico Health Department reported that out of 667,753 patients who attended public health facilities on the island, 387,091 had annual income of less than $12,501; 57,750 of less than $3,300, 45 less than $5,800. Only 891 persons had annual income of $12,800 or more. Some 75% of the patients at public institutions are indigent.

**9.** Nieves conceded that the district court correctly treated defendants' motion to dismiss as a motion for summary judgment. See Fed.R.Civ.P. 12(b)-(c). Thus, as the nonmoving party, Nieves was required to "set forth specific facts showing that there was a genuine issue for trial." Fed. R.Civ.P. 56(e). Quoting data out of context, Nieves did not attach either the full or excerpted reports she cited as the source of those data. See, e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 49–50 (1st Cir.1990). Factual assertions by counsel in motion papers, memoranda, briefs, or other such "self-serving" documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment. See, e.g., Fragoso v. Lopez, 991 F.2d 878, 887 (1st Cir.1993); Transurface Carriers, Inc. v. Ford Motor Co., 738 F.2d 42, 46 (1st Cir.1984); see generally 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Proce-

dure § 2723, at 63–65 (1983 & Supp.1993); cf. also Fed.R.Evid. 201(d) (judicial notice of adjudicative facts is required only where proponent supplies court with necessary information).

**10.** For example, the opposition memorandum states that only 891 out of 667,753 persons treated at public health facilities in 1988 had annual incomes in excess of $12,800, and that Puerto Rico's "per capita income" that year was $18,705. It does not specify, however, whether the $18,705 figure is the median or the average annual income, nor explain the basis for selecting $12,800 as the "poverty" cut-off figure, nor indicate the percentage of the total population of Puerto Rico that falls below the suggested "poverty" cut-off.

Moreover, the data presented in the memorandum are inconsistent. Although the memorandum asserts that 75% of public health patients were "indigent," the other figures cited, if taken to be poverty "lines," would yield indigency rates of either 66% (444,886 patients of 667,753 below $12,501), or more than 98% (666,862 out of 667,753 below $12,800). Both the 66% and the 98% indigency rates assume that the ambiguous figure of 387,091 does not really include all patients with incomes "less than $12,501," as Nieves describes, but only those with incomes falling between $3300 and $12,501. If Nieves' other cited figures (57,750 patients and 45 patients) merely represent further breakdowns of this overall figure of 387,091 patients, the indigency rate actually falls to 58%.

Given this shortfall, we simply lack a reliable evidentiary base from which to appraise whether section 4105 discriminates against the alleged suspect classification under Commonwealth law.[11]

### 2. Fundamental Right to Civil Suit for Damages.

■ Nieves' alternate constitutional claim bypasses the problematic "poverty" classification discussed above. Nieves contends that "strict scrutiny" analysis is required because the Puerto Rico Constitution guarantees the "fundamental" right to maintain a civil suit for full compensatory damages, see *Torres v. Castillo Alicea*, 111 P.R. Dec. 792, 801–802 (1981), without regard to whether the challenged statutory classification targets a suspect class. She argues that section 4105 unconstitutionally deprives a non-suspect class—all patients who use Puerto Rico public health services—of this fundamental right without positing a *compelling* governmental interest in its classification scheme. *But cf., e.g., Christensen v. Ward*, 916 F.2d 1462, 1472 (10th Cir.) (pursuit of state-law tort action not fundamental right guaranteed by Federal Constitution), *cert. denied*, 498 U.S. 999, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990); *Edelstein v. Wilentz*, 812 F.2d 128, 131 (3d Cir.1987) (same).

In *Alicea v. Córdova Iturregui*, 117 P.R. Dec. 676 (1986), the Puerto Rico Supreme Court struck down P.R.Laws Ann. tit. 26, § 4109(1), a MHPLIA companion provision to section 4105, which established a maximum two-year statute of limitations for all medical malpractice claims, without regard to whether the injury was discoverable within the two-year limitations period. The court noted that section 4109 created different (albeit non-suspect) classifications for patients who sustained patent injuries and patients with latent injuries. *Id.* at 688. The court reaffirmed its earlier statement in *Torres* "that the right to commence a civil action is a *fundamental right*," and went on to conclude that "any legislative classification affecting such right will have to withstand the strict judicial scrutiny analysis." *Id.* at 690 (citing *Torres*, 111 P.R. Dec. at 801–02) (emphasis added). In *Alicea*, the court held that the Commonwealth lacked a sufficiently "compelling state interest" to justify even this non-suspect classification, and that the purported goals of the MHPLIA—assuring the general availability of medical malpractice insurance and avoiding the increasing medical costs and declining quality of care associated with exorbitant malpractice insurance premiums—would not do. *Id.* at 693.

The *Alicea* court's depiction of *Torres* has engendered a splintered precedent that ultimately undermines Nieves' argument. Only two justices joined the opinion of the court in *Alicea* without reservation. Three justices filed separate concurrences; one justice lodged a vigorous dissent.[12] In her concurring opinion, Justice Naveira de Rodón concluded that the right to bring a civil suit for damages was at best a "property" right, and though section 4109(1) was violative of procedural due process, she opined that *Torres* did *not* recognize a "fundamental" constitutional right of access to the civil courts. *Alicea*, 117 P.R. Dec at 699–70 n. 1 (Naveira de Rodón, J., concurring).[13] Moreover, the dissent warned that such a reading of *Torres* would expose all Puerto Rico civil statutes of limitations to strict scrutiny. *Id.* at 710 (Rebollo López, J., dissenting). Thus, five of the seven justices on the Court did not endorse Nieves' interpretation of *Torres*. See *In re San Juan Dupont Plaza Hotel Fire Litig.*,

11. The Puerto Rico Supreme Court would reject any certification of this factually undeveloped issue. *See Pan Am. Computer Corp. v. Data Gen. Corp.*, 112 P.R. Dec. 780, 788 (1982) (Rule 27 certification is warranted only if, *inter alia*, "the case makes an account of all the facts relevant to said questions showing clearly the nature of the controversy giving rise to the questions").

12. Justice Denton did not participate in the *Alicea* decision, and Justice Pons Nuñez concurred without a separate opinion.

13. The concurrence aptly notes that, unlike states such as Texas and Arizona that presumably recognize such a fundamental constitutional right, *see Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984); *Nelson v. Krusen*, 678 S.W.2d 918 (Tex.1984), Puerto Rico has no separate or explicit "open access to courts" provision in its constitution.

687 F.Supp. 716, 733–34 (D.P.R.1988) (citing *Alicea* as support for interpreting *Torres* as recognizing a "property" right, not a "fundamental" right, to bring civil suit for damages); *see also Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (noting that, when no rationale commands the respect of a majority of the court, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the *narrowest grounds*") (emphasis added).

Moreover, our own analysis of the *Torres* decision confirms that the reservations expressed by the concurring and dissenting justices in *Alicea* conflict with the broader interpretation of *Torres* proposed by Nieves. *Torres* struck down a statute which capped tort damages in malpractice actions against the Commonwealth, but permitted plaintiffs who won higher jury awards to petition the Legislature for special exemption from the caps. *See Torres*, 111 P.R. Dec. at 795. Although *Torres* cites language suggesting that the challenged statute fatally impeded a "fundamental" right to bring a civil action, the court struck down the statute without mentioning the need to demonstrate a "compelling state interest," thereby raising grave doubt whether "strict scrutiny" analysis was engaged. Arguably, at least, *Torres* invalidated the legislative exemption scheme simply as an undue encroachment on the judicial branch, "in contravention to the principle of separation of powers." *Id.* at 803; *cf. Vélez Ruiz v. Commonwealth of Puerto Rico*, 111 P.R. Dec. 747, 762 (1981) (striking down

MHPLIA's compulsory arbitration provision as undue interference in judicial function). Thus, Nieves' proposed reading of *Torres*, the mooring for her constitutional claim, derives from language which may well be mere dicta.

Since a majority of the Puerto Rico Supreme Court has not interpreted (indeed, has declined, as in *Alicea*, to interpret) *Torres* as Nieves urges, it would be unfitting for us to chart the future course of Commonwealth law or to enlist the Puerto Rico Supreme Court in her pathfinding effort. *See Venezia v. Miller Brewing Co.*, 626 F.2d 188, 192 n. 5 (1st Cir.1980) (court should be wary of certification where requesting party merely seeks to persuade state court to *extend* current state law). State-law claimants who bypass an available state forum generally are not entitled to adventurous state-law interpretations from the federal forum,[14] nor have we been receptive to their requests for certification newly asserted on appeal.[15] While Nieves did not raise the section 4105 "defense," of course, it was a clearly foreseeable response to her federal complaint against appellees.

## B. Definition of "Employee" in Section 4105.

Finally, Nieves contends that a genuine issue of material fact remained with respect to whether Drs. Gelpí and González Recio were independent contractors working for UPR pursuant to a contract with the

---

14. *See Putnam Resources v. Pateman*, 958 F.2d 448, 470 n. 25 (1st Cir.1992); *Carlton v. Worcester Ins. Co.*, 923 F.2d 1, 3 (1st Cir.1991); *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 744 (1st Cir.1990); *Taylor v. Aetna Casualty and Sur. Co.*, 867 F.2d 705, 706 (1st Cir.1989); *see also Tidler v. Eli Lilly and Co.*, 851 F.2d 418 at 425 (D.C.Cir. 1988).

15. *See Fischer v. Bar Harbor Banking & Trust Co.*, 857 F.2d 4, 8 (1st Cir.1988), *cert. denied*, 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989); *Cantwell v. University of Massachusetts*, 551 F.2d 879, 888 (1st Cir.1977); *see also Seaboard Sur. Co. v. Garrison, Webb & Stanaland, P.A.*, 823 F.2d 434, 438 (11th Cir.1987); *Colonial Park Country Club v. Joan of Arc*, 746 F.2d 1425, 1429 (10th Cir.1984); *Smith v. FCX, Inc.*, 744 F.2d 1378, 1379 (4th Cir.1984), *cert. denied*, 471

U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 848 (1985).

Nieves first requested certification on appeal; thus her entitlement is "considerably weaken[ed]." *Boston Car Co., Inc. v. Acura Auto. Div., Am. Honda Motor Co.*, 971 F.2d 811, 817 n. 3 (1st Cir.1992); *see also Croteau v. Olin Corp.*, 884 F.2d 45, 46 (1st Cir.1989); *Fischer*, 857 F.2d at 8; *Tidler*, 851 F.2d at 426; *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 210 (8th Cir.1987) ("The practice of requesting certification after an adverse judgment has been entered should be discouraged."). Absent a timely request to the district court, the requesting party must advance some "compelling" reason for certification on appeal. *Id.* Although on occasion we have ordered certification *sua sponte*, we find here no countervailing reasons for allowing certification in these circumstances.

Hospital, a privately-owned medical facility. *See Flores Román v. Ramos,* 90 J.T.S. 132, at 8243–44 (1990) (holding that physicians who were merely independent contractors of Commonwealth, and not its "employees," were not entitled to section 4105 immunity). To determine whether a physician claiming section 4105 immunity is an "independent contractor," or merely a Commonwealth "employee," the court must consider the totality of the circumstances, focusing principally on the level of control contractually reserved to the governmental entity over the physician's provision of patient services. *See Flores Román,* 90 J.T.S. 132, at 8244. Relevant indicia of "independent contractor" status may include, *inter alia,* evidence that the physician

(1) earned compensation on a per-patient basis, rather than a flat salary;

(2) received no fringe benefits of a type given to the principal's employees (*e.g.,* vacation or sick leave, pension benefits, tax withholding);

(3) personally owned, invested in, or paid for the medical equipment and supplies used to treat patients, or the facilities which formed the situs of that treatment, or personally hired and supervised her own administrative or subsidiary medical personnel;

(4) held and paid for her own medical malpractice insurance policy; or

(5) exercised final judgment as to the appropriate medical treatment to render to patients.

*Id.; see also Rivera v. Hospital Universitario,* 762 F.Supp. 15, 17 (D.P.R.1991).

On appeal, Nieves and the appellees bandy various statements relating to the physicians' status, without much regard to whether these "facts" were ever substantiated in the

summary judgment record as required by Rule 56. In their answer and motion to dismiss, Drs. Gelpí and González Recio claimed that they were "state employed physicians" entitled to section 4105 immunity. Later, they introduced a sworn statement by John M. Román Rodríguez, Dean of UPR's Medical Science Campus and custodian of its personnel records, attesting that Dr. González Recio was an "employee" of the UPR medical school in December 1983, and that Dr. Gelpí, while not an "employee" of UPR, was enrolled as a "resident" in training in UPR's medical graduate program.[16]

Nieves conceded at oral argument that the motion to dismiss was properly converted to a motion for summary judgment pursuant to Fed.R.Civ.P. 12(b)-(c). As the nonmoving party, Nieves was required to set forth specific facts demonstrating a trialworthy issue as to whether these defendant physicians were independent contractors. *See* Fed. R.Civ.P. 56(e). In support of her "independent contractor" theory, Nieves contends that (1) prior to December 1983, pursuant to contract, UPR placed its faculty and medical graduate students (residents and interns) at the Hospital for training purposes, the Hospital paid UPR for their services, and UPR paid the physicians a salary out of the contract proceeds; (2) Dr. González Recio, Dr. Gelpí's supervisor, headed the Hospital's OB–GYN department, and received no direct supervision in the performance of her Hospital duties from any UPR official; (3) UPR carried malpractice insurance coverage on both physicians at its own expense, allegedly a superfluous expenditure if the physicians were "employees" entitled to section 4105 immunity; and (4) the medical equipment and facilities the defendant physicians used

---

16. We assume for present purposes that appellees had the burden of proof with respect to their status as Commonwealth "employees." *See* P.R.Laws Ann. tit. 32, § 1971; *but see supra* note 2. We note, however, that Nieves might have raised a distinct issue of statutory interpretation in the district court and on appeal; namely, whether the affiant's mere assertion that Gelpí was a UPR medical "resident" or trainee was probative, as a matter of law, of his status as a UPR "employee" under section 4105. Generally speaking, of course, not all UPR students would necessarily be deemed school "employees" merely by virtue of their student status. But as framed on appeal, Nieves' argument does not contest Gelpí's status as a UPR "employee" on this ground. Therefore, we merely consider whether there was a genuine factual dispute as to Gelpí's status as an "independent contractor" of UPR. *See Vanhaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 5 (1st Cir.1993) (party to diversity action waives state-law interpretation not raised in district court at summary judgment); *see also Hansen v. Continental Ins. Co.,* 940 F.2d 971, 983 n. 9 (5th Cir.1991) (same).

to treat patients were neither provided nor owned by UPR. Nieves faces two difficulties on appeal.

First, assuming these "facts" to be probative on the issue of "independent contractor" status (*e.g.*, minimal UPR supervision of Dr. González Recio), the only "proof" presented by Nieves consisted of the undocumented and unsubstantiated assertions contained in her opposition memorandum of January 31, 1992. Although Nieves argues that "the facts ... depend on the supervision and control over [the doctors'] functions *pursuant to contract*," and even though she deposed both physicians and conducted discovery for eight months prior to dismissal, she never submitted the pertinent contract provisions, the malpractice insurance policies, or an affidavit in support of the factual assertions set forth in her opposition memorandum.[17] Factual assertions by counsel in motion papers, memoranda, or briefs are generally not sufficient to generate a trialworthy issue. *See Fragoso v. Lopez*, 991 F.2d 878, 887 (1st Cir.1993); *see also In re Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir.1985); *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir.1982).

Second, even though a party may not generate a trial-worthy dispute at summary judgment merely by presenting unsubstantiated allegations in its memoranda or briefs, a party may nonetheless concede facts *adverse* to its position on summary judgment. *See* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure* § 2723, at 63–65 (1983 & Supp.1993) (adverse facts are the functional equivalent of "admissions on file" explicitly cognizable under Rule 56). Nieves makes several important concessions relevant to the appropriate "independent contractor" analysis prescribed by *Flores Román*. The mere existence of a

residency contract between UPR and the Hospital, together with UPR's payment of the physicians' salaries, indicates that UPR exercised ultimate "control" over the conditions under which the doctors were to provide medical services at the Hospital. Further, UPR's provision and payment of medical malpractice insurance coverage for these physicians suggested, unless competently rebutted, an employer-employee relationship between UPR and these physicians under the UPR–Hospital contract. *Cf. Flores Román*, 90 J.T.S. 132, at 8244 (because physicians' contract with state agency gave them absolute control over medical treatment, contract also required the doctors to pay for, and maintain in force at all times, their own malpractice insurance policies, and to reimburse government entity for all legal expenses arising from the doctors' negligent acts).[18] Finally, Nieves misapprehends the fundamental message of *Flores Román*, by arguing that the Hospital's ownership of the medical equipment and facilities establishes that the doctors were independent contractors. The proper focus is not whether the putative principal (*viz.*, UPR) owns or controls the equipment and facilities, but whether the performing party (*viz.*, the physician) uses his own "tools" to perform the required services. Nieves readily concedes that these physicians did not own the medical equipment used to treat their patients, nor did they hire or supervise their own support personnel, nor contribute to Hospital operating expenses. Moreover, individual physicians did not contract with the Hospital to obtain privileges or accommodations. *Cf. Flores Román*, 90 J.T.S. 132, at 8244 (noting that the contract provided that the contract doctors would hire their own support personnel, and treat patients with their own equipment, at their own facilities).

We conclude that the summary judgment record contained no competent evi-

---

**17.** We appreciate that Nieves may have been caught off guard by appellees' reply memorandum, filed three weeks after the court's dismissal order. Nevertheless, if Nieves lacked sufficient time to present her evidence in admissible form, she could have moved for a continuance pursuant to Fed.R.Civ.P. 12(c) and 56(f).

**18.** Nieves argues that UPR would not need to insure the physicians if they were "employees,"

hence absolutely immune from liability under section 4105. Of course, this is not necessarily true, since UPR, as an "arm" of the Commonwealth, could still be liable for the negligence of its immune employees up to the statutory limits prescribed by P.R. Laws Ann. tit. 32, § 3077(a). *See supra* pp. 272–73.

dence, and accordingly did not raise a colorable factual dispute, from which the district court could have made a determination that either physician was an "independent contractor" of UPR. Appellees therefore were entitled to judgment as a matter of law.[19]

*Affirmed.*

---

**19.** On appeal, Nieves argues for the first time that Dr. Gelpí produced no evidence that he was a "health care professional" within the meaning of the MHPLIA. We decline to address this belated claim as it was never raised in the district court. *See Miller v. United States Postal Serv.,* 985 F.2d 9, 12 (1st Cir.1993).