BALSON, Admr., et al., Appellees,

v.

OHIO STATE UNIVERSITY, Appellee;

Myerowitz et al., Appellants.

BALSON, Admr., et al., Appellees,

v.

OHIO STATE UNIVERSITY, Appellee;

Ross, Appellant.

[Cite as *Balson v. Ohio State Univ.* (1996), 112 Ohio App.3d 33.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 95API10–1344, 95API10–1345.

Decided June 25, 1996.

34

*Gerald J. Todaro,* for appellees Melanie Balson and Franklin Klingel.

*Emens, Kegler, Brown & Ritter, Karl W. Schedler* and *William J. Brown,* Special Counsel, for appellee Ohio State University.

*Lane, Alton & Horst, Jack R. Alton* and *Mary Barley–McBride,* for appellants P. David Myerowitz, M.D., and Department of Surgery Corporation, P.C.

*Ulmer & Berne* and *Edwin J. Hollern,* for appellant Patrick Ross, Jr., M.D.

DESHLER, Judge.

Defendants, Dr. P. David Myerowitz and Dr. Patrick Ross, both appeal from a judgment of the Ohio Court of Claims, finding that defendants were not entitled to immunity for alleged acts of negligence arising out of medical treatment received by Carole Klingel at Ohio State University Hospital.

On December 1, 1993, Carole Klingel underwent open heart surgery at the Ohio State University ("OSU"). Klingel suffered from aortic stenosis, a condition causing the narrowing of a valve in her heart. Ross, an assistant professor in the Department of Surgery, Division of Thoracic and Cardiovascular Surgery at OSU and a member of the Department of Surgery Corporation, P.C. ("DSC"), was Klingel's attending surgeon. The surgery involved the replacement of Klingel's native aortic valve with a prosthetic valve.

Following the surgery, Klingel and her husband, Franklin Klingel, filed a complaint and an amended complaint in the Franklin County Court of Common Pleas, naming as defendants Ross, Myerowitz and DSC. The complaint alleged that Ross was negligent in his performance of the aortic valve replacement and in his postoperative care of Carole Klingel. The complaint further alleged that Myerowitz, the Division Chief of Thoracic Surgery at OSU, as well as a member of the Board of Directors of DSC, was negligent in failing to maintain the quality of care in his division at OSU and was further negligent in adopting policies which increased the risk of injury to patients referred within the university system to defendant Ross. On January 6, 1995, Carole and Franklin Klingel filed a complaint in the Ohio Court of Claims against defendant OSU, alleging in part that OSU was vicariously liable for the conduct of DSC, Myerowitz and Ross for their acts of negligence.[1]

On February 3, 1995, Ross filed a motion in the Court of Claims, seeking leave to intervene as a defendant for the limited purpose of participating in an immunity determination scheduled to be held pursuant to R.C. 2743.02. Myerowitz and DSC filed a similar motion on that date. The Court of Claims sustained the motions of Ross and Myerowitz, holding that the physicians would be permitted to participate as parties for the sole purpose of the R.C. 2743.02 hearing.

An immunity hearing was conducted by the Court of Claims beginning on April 26, 1995. The Court of Claims issued a decision on June 22, 1995, holding that neither Ross nor Myerowitz were entitled to immunity, based upon the court's determination that their actions were outside the scope of their employment with OSU. See 72 Ohio Misc.2d 25, 655 N.E.2d 457.

Following the immunity hearing, the Court of Claims issued findings of fact in support of its decision. The court's findings of fact are summarized as follows: DSC is an Ohio corporation owned by shareholders consisting of faculty members of the OSU Hospital licensed to practice medicine. Neither OSU nor the OSU

---

1. Following defendants' appeal from the judgment of the Court of Claims, this court granted plaintiffs' motion to substitute Melanie Balson, administrator of the estate of Carole Klingel, as party plaintiff for the deceased Carole Klingel.

Hospital is a shareholder in the corporation. DSC was formed under a closed corporation agreement executed on January 22, 1986, as a direct result of the OSU College of Medicine Practice Plan reorganizing the Central Practice Group within the university. The purpose of the Central Practice Group is the administration of patient care practice conducted by its members, including the collection of fees, payment of staff surgeons, the distribution of practice income and contributions to the university's Academic Enrichment Program and teaching and research funds.

The OSU College of Medicine Practice Plan assigns income-producing activity to the Central Practice Group within the university system. DSC provides professional liability insurance for malpractice claims for each of its shareholders.

The Division of Thoracic and Cardiothoracic Surgery, like other surgical divisions of OSU, is part of the corporation and operates from an approved annual budget that outlines projected income and expenses. The Division of Thoracic and Cardiothoracic Surgery must meet its annual budget requirements or face a reduction in compensation and benefits for shareholders within its division. The minutes of the corporation reflect that each division must operate at a profit, the addition or elimination of staff is predicated primarily on profit and loss outcomes, and a significant component of corporate activity involves monitoring the flow of patients, patient billing, developing access to new patients and negotiating with insurance companies in the general pursuit to capture elective surgeries.

DSC is not an employee of the OSU Hospital, nor does it operate on a personal services contract. Ross and Myerowitz are shareholders of the corporation. Myerowitz, at all times pertinent, served on the board of DSC and chaired the fiscal committee. The corporation's contribution to the Teaching and Research Fund and the Academic Enrichment Program is calculated by the amount of the total annual practice income. The corporation's contribution to teaching, research and academic programs is a cost of doing business dependent upon the income earned through patient billings.

On December 1, 1993, Ross performed open heart surgery on Carole Klingel. Ross treated Klingel through the practice plan corporation. The fee for that service was billed by DSC to the patient's insurance carrier, and the fee was paid directly by the patient's carrier to DSC. The services of a resident were included in the billings invoiced by DSC to the patient. Ross received a salary for the delivery of surgical services from DSC, which included the type of surgery performed on Klingel. Ross has separate malpractice liability coverage provided by DSC.

The Court of Claims also made the following specific findings of fact regarding Myerowitz: From the period of 1985 to the present, Myerowitz has allegedly

attempted to control the referral of all heart patients within the university system, whether emergency or elective cases, by threatening to withhold availability of surgical backup for physicians who referred heart patients elsewhere. Myerowitz's alleged attempts to control the referral of elective heart surgery cases "is directly related to the fiscal interest of the Corporation, and not related to teaching or research."

Notices of appeal were filed by defendants Ross, Myerowitz and DSC. On appeal, defendant Ross asserts the following five assignments of error for review:

"I. The court below erred in holding that Dr. Ross acted outside the scope of his employment with the Ohio State University when he was performing surgery, because patient care was one of the three missions that the university required its physician/faculty to accomplish and Dr. Ross performed that required task.

"II. The court below erred when it failed to properly apply R.C. § 9.86 to the undisputed facts adduced at the R.C. § 2743.02(F) immunity hearing and held that Dr. Ross was acting outside the scope of his employment with the Ohio State University.

"III. The decision of the trial court is against the manifest weight of the evidence and the court below erred in holding that Dr. Ross acted manifestly outside the scope of his employment with the university when he was performing surgery.

"IV. The court below erred by violating the doctrine of separation of powers when it ignored the clear and unambiguous intent of the General Assembly as codified in R.C. § 9.86 and created judicial legislation by holding that Dr. Ross was acting outside the scope of his employment with the university.

"V. The Court of Claims violated the Equal Protection Clause and the Privileges and Immunities Clause as set forth in Article I, Section 2 of the Ohio Constitution and the Fourteenth Amendment of the United States Constitution."

Defendant Myerowitz asserts the following five assignments of error for review:

"I. The Court of Claims erred in finding that defendant-appellant P. David Myerowitz, M.D., is not entitled to immunity pursuant to O.R.C. § 9.86.

"II. The Court of Claims' decision that defendant-appellant P. David Myerowitz, M.D., is not entitled to immunity is against the manifest weight of the evidence.

"III. The Court of Claims' decision that defendant-appellant P. David Myerowitz, M.D., is not entitled to immunity is contrary to established Ohio law.

"IV. The Court of Claims' decision is erroneous since its application of O.R.C. § 9.86 and O.R.C. § 109.36 to defendant-appellant P. David Myerowitz, M.D.,

violates the Equal Protection Clause of the United States Constitution, Fourteenth Amendment, and the Ohio Constitution, Article I, § 2.

"V.   The Court of Claims' decision as applied to defendant-appellant P. David Myerowitz, M.D., violates the separation of powers doctrine, a fundamental tenet of the United States government and the Ohio government."

We will first address the assignments of error set forth by defendant Ross. The first three assignments of error are interrelated and will be considered together.

The basic contention raised under these assignments of error is that Ross was a full-time employee of OSU and was not acting "manifestly outside the scope of that employment" when he performed the surgery on plaintiff Carole Klingel. Thus, Ross argues, he is entitled to immunity pursuant to R.C. 9.86 and 2743.02.

R.C. 9.86 provides:

"Except for civil actions that arise out of the operation of a motor vehicle and civil actions in which the state is the plaintiff, no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

"This section does not eliminate, limit, or reduce any immunity from civil liability that is conferred upon an officer or employee by any other provision of the Revised Code or by case law.   This section does not affect the liability of the state in an action filed against the state in the court of claims pursuant to Chapter 2743 of the Revised Code."

R.C. 2743.02(F) provides in part:

"A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of his employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims, which has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action."

The record in the instant case indicates that, effective July 1, 1985, the OSU Board of Trustees adopted a "change in the Ohio State University College of Medicine Medical Practice Plan" ("practice plan").   The practice plan provides in part that the policies "shall be incorporated in and be a part of the annual

contract of employment between The Ohio State University and all regular and auxiliary faculty members appointed in a Division or Department of the College of Medicine." Pursuant to the practice plan, "[a]s a condition of faculty employment, all regular faculty members first appointed on or after July 1, 1985, will be required to join and remain members of the central practice plan group of the Department or Division to which they are appointed."

In 1991, Ross accepted a position with OSU as an assistant professor in the Department of Surgery, Division of Thoracic and Cardiovascular Surgery. His annual salary from OSU was set at $28,000. At the same time, Ross was also offered a position as a physician with the Cardio–Thoracic Surgery Division of DSC, part of the central practice group, with a starting salary of $121,920. As noted by the Court of Claims in its findings of fact, the DSC was formed under a closed corporation agreement executed on January 22, 1986, and the formation of DSC was a direct result of the OSU practice plan reorganizing the central practice group within the university.

Ross contends that, as a physician-faculty member of OSU, he was required to advance the university's three missions of teaching, research and patient care, and that at no time during the performance of his duties did he deviate from his role as an assistant professor of surgery in a state-owned and -operated hospital. Ross further argues that to hold that he was acting outside the scope of his employment at the time he was caring for Carole Klingel would require an arbitrary and capricious determination as to which specific acts fall either outside or within the scope of his employment with OSU.

The issue of "scope of employment" in the context of a physician holding a faculty position at a university while a member of a private medical corporation has been addressed by this court on previous occasions. In *Katko v. Balcerzak* (1987), 41 Ohio App.3d 375, 536 N.E.2d 10, plaintiff's decedent appealed from a grant of summary judgment in favor of the defendant, an OSU faculty member who was also associated with a medical partnership. In *Katko*, facts were presented upon consideration of a summary judgment motion that defendant treated patients as private patients, billing them for his services through a medical partnership; no part of the payment for treatment of patients was paid over to OSU, although the partnership did make a contribution to the university in the nature of payment for rent; and the partnership paid for partnership business services, including telephone and billing equipment. Further, during deposition testimony, the defendant-physician stated that it was difficult for him to define when his teaching role ended and his patient care began, and he indicated that "the services for the university performed in connection with treating patients was in the nature of teaching and research, rather than rendering medical care for a fee." *Id.* at 379, 536 N.E.2d at 14.

In reversing the trial court's grant of summary judgment in favor of the defendant, this court found that there existed a factual issue regarding whether defendant was acting within the scope of his employment with OSU when he rendered medical care and services to plaintiff's decedent. Specifically, this court held:

" * * * The fact that [defendant] rendered the services to the plaintiff's decedent as a private patient and received payment for his services through the partnership, no part of which was paid over to Ohio State University, tends to indicate that, in treating the patient, [defendant] was acting outside the scope of his duties for Ohio State University and conducting a business of his own, albeit in connection with his employment at Ohio State University." *Id.* at 379, 536 N.E.2d at 14.

This court followed the reasoning of *Katko* in a recent decision, *York v. Univ. of Cincinnati Med. Ctr.* (Apr. 23, 1996), Franklin App. No. 95API09–1117, unreported, 1996 WL 200324, involving an action against the University of Cincinnati Medical Center and a physician, Dr. John Tew. Under the facts of that case, Tew, who was the Chairman of the Department of Neurosurgery at the University of Cincinnati, simultaneously held the position of director of the academic division of Mayfield Neurological Institute, Inc. ("MNI"), a privately owned professional association. In *York*, the Court of Claims found that Tew was acting manifestly outside the scope of his employment with the University of Cincinnati when he rendered medical treatment to plaintiff.

On appeal, this court affirmed, relying on *Katko, supra.* More specifically, this court held:

"In this case, Dr. Tew has been Chairman of the Department of Neurosurgery at the University of Cincinnati since 1984, and he received compensation from the University of Cincinnati in the sum of $54,387.63 for his services in 1992. Dr. Tew is also an employee of MNI and received more than $700,000 in compensation from MNI for patient care services in 1992. MNI also carried malpractice insurance coverage for Dr. Tew in 1992. Dr. Tew agreed to provide medical services to Mr. York for a price and he billed Mr. York for those services through MNI in the sum of $12,000. The testimony establishes that only two percent of Dr. York's fee was actually remitted to the University of Cincinnati.

"Applying the logic of the *Katko* decision herein leads this court to the same conclusion reached by the Court of Claims. Dr. Tew was paid nothing by the University for the medical services rendered to Mr. York. This fact evidences the lack of an employment relationship with respect to the medical services rendered. See *Latham v. Ohio State Univ. Hosp.* (1991), 71 Ohio App.3d 535, 538 [594 N.E.2d 1077, 1079]. Although the university did receive a small financial gain from the surgical procedure performed on Mr. York, we do not believe that

this fact, standing alone, gives rise to an employment relationship between the university and Dr. Tew with respect to the surgery."

The facts of the instant case are similar to those in *Katko* and *York*, and we find the reasoning in those cases dispositive. In the present case, Ross, while employed by OSU as an associate professor, also has a contract with DSC as a physician in the Cardio–Thoracic Surgery Division of the corporation. The salary provisions outlined in the university practice plan for faculty members of the College of Medicine provide that the Dean, in recommending such salary, is to "consider each faculty member's teaching and administrative performance and research productivity." The letter of offer Ross received from OSU indicated that the salary and benefits available to him through DSC would be outlined in a "separate contract." The offer letter further provided that "[a]ll patient care related revenue * * * will revert to the Department of Surgery Corporation * * *."

The facts of this case further indicate that Carole Klingel was billed by DSC for the services performed and payment was made directly to DSC by the patient's insurance carrier. Ross received a salary from DSC for his services. His salary, as well as those of other surgeons in DSC, is provided by revenues generated from fees charged to patients for services rendered by the physician members of the corporation. DSC also provides malpractice insurance for its shareholders, including Ross. While there was evidence indicating that a portion of practice income goes to the university, including contributions to a "Teaching and Research Fund," the practice plan in general, subject to such obligations, provides that regular and auxiliary faculty members "may establish their professional fees and bill for, collect, and retain all fees for services rendered by such faculty members." The facts of this case support a finding that Ross, in performing surgery on Carole Klingel, was treating a private patient in his capacity as an employee of DSC, albeit "in connection with his employment" at OSU. *Katko, supra*, 41 Ohio App.3d at 379, 536 N.E.2d at 14.[2]

Upon review of the record, and applying the rationale of this court's previous decisions in *Katko* and *York*, the Court of Claims did not err in holding that Ross was acting outside the scope of his employment with OSU during the treatment of Carole Klingel. Ross's first, second and third assignments of error are overruled.

---

2. We note that, while defendant Ross contends that he "did not have any choice but to join" DSC and have the corporation bill for patient care, the practice plan at issue provides that a member has the option to become a "strict full-time faculty member," whereby practice income may be retained by OSU.

The fourth and fifth assignments of error of defendant Ross will be considered together. Under these assignments of error, Ross raises contentions that the Court of Claims' application of R.C. 2743.02(F) and 9.86 was in violation of the doctrine of separation of powers and resulted in a denial of equal protection of the law.

Regarding his equal protection argument, Ross argues that the Court of Claims has arbitrarily applied the immunity statute so as to deny him the immunity afforded every other state employee. We are unpersuaded.

In *Massachusetts Bd. of Retirement v. Murgia* (1976), 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520, 524, the United States Supreme Court held that "equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." A "suspect class" is defined as "one 'saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Id.* at 313, 96 S.Ct. at 2567, 49 L.Ed.2d at 524–525.

Defendant Ross, a professor of surgery at a state-supported college of medicine, does not fall within a suspect classification. Nor is immunity from suit a fundamental constitutional right. See *Nieves v. Univ. of Puerto Rico* (C.A.1, 1993), 7 F.3d 270, 274, fn. 7. Thus, the standard of review is the rational basis test. We note that the Ohio Supreme Court has previously held that R.C. 2743.02 "is reasonable and does not violate equal protection of the laws." *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 291, 595 N.E.2d 862, 868. Upon application of the rational basis test, we agree with defendant OSU's contention that there is a rational basis for distinguishing between claims arising out of the private practice of medicine for private remuneration and claims arising out of employment services paid by a state employer for teaching, research and administrative duties.

Finally, we find no merit to Ross's assertion that the Court of Claims rewrote R.C. 9.86 and 2743.02(F), in violation of the doctrine of separation of powers, when it determined that he was acting outside the scope of his employment in performing surgery on Carole Klingel. The court's inquiry regarding this issue involved a question of fact and, based upon its reliance on this court's decision in *Katko, supra,* the Court of Claims applied the law to the facts and properly rendered its decision.

The fourth and fifth assignments of error of defendant Ross are without merit and are overruled.

■ We next address the assignments of error raised by defendant Myerowitz. The first three assignments of error all raise challenges to the Court of Claims' determination that Myerowitz was not entitled to immunity, as his alleged activity was outside the scope of his employment with OSU. Accordingly, we will address these assignments of error together.

The record in this case indicates that Myerowitz is the Chief of the Division of Thoracic and Cardiovascular Surgery at OSU and that he also serves as an executive vice president of DSC. It is undisputed that Myerowitz took no part in the medical treatment of Carole Klingel, and there was no evidence that she was billed for his services. Myerowitz, however, was named as a defendant in the original action filed in the court of common pleas based upon allegations that he failed to take the necessary precautions to reduce the risk of injury to Carole Klingel and that he was negligent "when he enacted formal and informal policies which systematically increased the risk of injury to patients referred within the University system to Defendant Ross."

In holding that Myerowitz was not entitled to immunity, the Court of Claims focused upon alleged policies implemented by him regarding the referral of patients. Specifically, the Court of Claims held:

"Dr. Myerowitz was * * * performing services for his private corporation when he allegedly attempted to control the referral of elective heart patients to the private corporation. The court finds such activity was not related to research or teaching students. Dr. Myerowitz's alleged activities were his efforts to improve the financial condition of the private corporation and to satisfy the staff physicians."

Thus, the basis of the court's decision was its finding of an alleged policy by Myerowitz regarding the referral of patients for the financial benefit of the corporation. Defendant OSU argues that, while there may have been some evidence indicating that Myerowitz had a monetary incentive to secure referrals within his division, the evidence fails to show that the referral of Carole Klingel to Ross had any relation to an alleged policy implemented by Myerowitz. We agree.

In the instant case, the record indicates that Carole Klingel was referred to Ross by Dr. Charles Love, an OSU staff cardiologist. Specifically, Love gave deposition testimony in which he related that Carole Klingel was admitted to OSU in November 1993 on a day in which his cardiology service was on call. Klingel was diagnosed with severe aortic stenosis, *i.e.*, restriction of the aortic valve. Love testified that he referred Carole Klingel to Ross for surgery to replace the valve. When asked whether it was his regular practice at that time to refer patients to Ross, Love stated that, "[i]n general, I was not referring my patients to Dr. Ross at that time."

Love was questioned during deposition in the following manner regarding his referral policy at that time and, more specifically, his reason for referring Carole Klingel to Ross in this instance:

"Q. Did you ever have any discussions with Dr. Myerowitz regarding your lack of referral of patients to Dr.—to Dr. Ross?

"A. No.

"Q. Were you ever questioned by Dr. Myerowitz about why you weren't referring patients to Dr. Ross?

"A. No.

"Q. Did you have some conversations prior to 1993 with Dr. Myerowitz regarding using surgeons outside of his group?

"A. I never had a conversation directly with him concerning that.

"Q. Who did you have the conversation with?

"A. The conversation was with members of the heart catheterization lab.

"Q. Do you know whether anyone talked to Dr. Myerowitz about the department of cardiology or physicians within the division of cardiology referring patients outside of his group?

" * * *

"A. I believe Dr. Bush had that conversation with him.

" * * *

"Q. Was any information passed on to you as to what the consequences would be if you referred patients elsewhere and not to his group?

" * * *

"A. I was told that if we would refer our patients outside of the group here, that our thoracic surgery group would not support us in terms of emergent problems that might occur in the laboratories.

" * * *

"Q. That was a conversation you had with Dr. Bush?

"A. Yes.

"Q. When did you start using Dr. Brown exclusively—well, I'm jumping ahead here. In terms of your referring patients to the thoracic surgery department, who—division, who did you refer patients to in December of 1993?

"A. Would have been in November, actually, when I was on service. The primary person that I was dealing with at that time was David Brown.

"Q. Why didn't you refer Carole Klingel to David Brown?

"A.   David Brown was out of town that week."

Thus, according to Love's testimony, he was not referring patients to Ross in November 1993; rather, at that time he was referring patients primarily to David Brown.   The referral to Ross in this instance occurred because Brown happened to be out of town.   Love provided testimony indicating that Myerowitz was not involved in this referral decision.   Love further indicated that he was never questioned by Myerowitz about why he was not referring patients to Ross and that he did not have any conversations with Myerowitz prior to 1993 regarding the use of surgeons outside his group.

Myerowitz testified at the immunity hearing that his office was not asked about a "consult request" regarding the surgery to be performed on Carole Klingel, and he indicated that he did not know why Love referred Klingel to Ross.   The primary evidence at the hearing regarding a "policy" by Myerowitz was a letter dated March 9, 1994, from Myerowitz to Dr. Carl Leier of the OSU Division of Cardiology, regarding the distribution of consults to various faculty.   As Chief of the Division of OSU's Thoracic and Cardiovascular Surgery Department, Myerowitz had the responsibility of receiving consults, reviewing cases and distributing consults to faculty members.   Myerowitz's letter stated:

"Over the past month or two, there has been a tendency to direct a majority of the consults to one specific faculty member.   With the turnover of faculty within the Division over the past two years and the addition of another new faculty member in July, I am quite concerned about our ability to provide services to Cardiology if a majority of elective cases are channeled to one particular faculty member.   * * *

"I would therefore request that the following policy be instituted effective immediately.   I would appreciate all consults being called into my office during the normal workday.   If there is an urgent consult, obviously anyone who is available will be happy to see the patient and try to help out.   * * * *"

Thus, evidence of a "policy" on the part of Myerowitz regarding patient referrals was based upon a letter dated March 9, 1994, approximately four months after Love made the decision to refer Carole Klingel to Ross.   Further, as noted above, the evidence regarding Love's decision indicated that he did not make the referral based upon any policy but, rather, on the basis that Brown was out of town at the time.   Thus, regardless of any alleged policy which may have been implemented in March 1994, plaintiffs did not present evidence indicating that the referral decision by Love was motivated by the policy.

Further, the record fails to show other evidence sufficient to indicate that Myerowitz, in performing his management responsibilities as Chief of the Division of Thoracic and Cardiovascular Surgery, acted outside the scope of his

employment at the time Carole Klingel was treated at OSU Hospital. Plaintiffs contend that Myerowitz established a policy "years ago" with the cardiology division as to referrals within the division and that the policy was enforced by threats regarding the availability of backup support in emergency cases. Plaintiffs cite deposition testimony by Dr. Charles Bush, a cardiologist at OSU Hospital and Dr. James Gadek, a pulmonary physician.

During his deposition, Bush was asked whether Myerowitz had ever threatened or made an implied threat that, if physicians went outside the university for referrals, the availability of emergency backup assistance might be in question. Bush denied that such a threat had been made, stating:

" * * * I think the conversation was in a way that indicates that * * * in order to develop the appropriate relationships, you have to work together on more than just the emergency cases.

"That was the context in which I took that. It was not an implied threat. It was not anything of that standpoint. It was a matter of * * * we need to work together on the elective cases as well as the emergency cases. If all you call us for is the emergency cases, we will not be able to provide you the same level of service. My understanding was that [this] was in relation to developing the working relationship."

Bush was also asked about a statement by Love regarding referrals outside the department. Bush indicated that the statement was in reference to a divisional meeting at which he spoke. He testified:

" * * * The statement that I made at the divisional meeting was, number one, that policy in regard to consultation and referral was dictated by medical staff bylaws that any physician had the right to consult any other physician in regard to patients.

"Number two, I said that it was my recommendation that if there were not other circumstances that I would recommend the referral of surgical patients to the current cardiothoracic surgical group.

"And I said the reasons for that include the fact that there was a group who was here all the time and was able to provide service all the time and provide emergency service all the time. The physicians outside the institution were not available with that regularity, and that my recommendation to the group was that we use that referral consultive practice unless there were specific reasons not to. And those specific reasons being patient requests, or specific reason from the physician that wanted to refer somewhere else.

"That was my recommendation to the division. That was not said as policy. That was my recommendation to the division, and it was presented in a way that

I said that's the practice that I followed, and that's the practice I thought was the best for the majority of our clinical practicing physicians."

Thus, Bush's testimony does not support a finding regarding a referral policy dictated by Myerowitz. Bush further testified that, in 1993, it was not the practice of the division of cardiology to refer all patients to the university surgical group.

Gadek's testimony also fails to support a finding that a referral policy existed. Specifically, Gadek testified that, although he had a discussion with Myerowitz regarding referrals to physicians outside the university system based upon Myerowitz's concern that such referrals "interfered with his ability to maintain an environment wherein training could be maintained at the best level," his faculty continued to refer patients to physicians outside the university group.

Based upon a review of the record in this case, we find that the Court of Claims erred in its determination that Myerowitz acted outside the scope of his employment in allegedly attempting to control the referral of patients. Accordingly, to the extent provided above, the first, second and third assignments of error of defendant Myerowitz are sustained.

In light of our disposition of Myerowitz's first three assignments of error, his fourth and fifth assignments of error are rendered moot.

Based upon the foregoing, the first, second, third, fourth and fifth assignments of error of defendant Ross are overruled, the first, second and third assignments of error of defendant Myerowitz are sustained, and the fourth and fifth assignments of error of defendant Myerowitz are rendered moot. The judgment of the Court of Claims is affirmed in part and reversed in part and this matter is remanded to the Court of Claims for further proceedings in accordance with law and consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

TYACK and LAZARUS, JJ., concur.