OPINION AND ORDER
 

 LAFFITTE, Chief Judge.
 

 Before the Court is Defendant Forest Laboratories, Inc.’s motion for summary judgment. Forest is a Delaware corporation engaged in the manufacturing of pharmaceutical products. Up until 1997 it owned a facility in Puerto Rico known as Sein Mendez Laboratories. Plaintiffs Domingo Velázquez Casillas (“Velázquez”), Carlos Matías Maldonado, Luis Pérez Aviles, Rafael Rodriguez Rivera, and Gum-ercinda Santiago Maceda are former employees of Sein Mendez.
 
 [1]
 
 This dispute arises out of negotiations between the parties to sell Sein Mendez to Plaintiffs. The sale was not consummated, and Plaintiffs brought this action, claiming that Forest is liable under the
 
 culpa in contrahendo
 
 doctrine.
 
 [2]
 
 The Court has jurisdiction based on diversity of the parties.
 
 [3]
 

 In ruling on a motion for summary judgment, a court reviews the record in the light most favorable to the plaintiff and
 
 *163
 
 draws all reasonable inferences in his favor.
 
 LeBlanc v. Great American Ins. Co.,
 
 6 F.3d 836, 841 (1st Cir.1993). Before proceeding to view the record through this plaintiff-friendly prism, however, it is necessary to provide some exposition on the procedural requirements for motions supporting and opposing summary judgment. A court reviewing a motion for summary judgment should consider the parties’ filings to the extent that they comply with the district’s local rules. Camilo-Robles
 
 v. Hoyos,
 
 151 F.3d 1, 9 n. 7 (1st Cir.1998). Puerto Rico’s Local Rules require that a motion for summary judgment be accompanied by a statement of material facts “to which the moving party contends there is no genuine issue to be tried ... properly supported by specific reference to the record.” Local Rule 311(12). These facts will be deemed admitted unless the nonmovant properly opposes them.
 
 Id.
 
 In order to demonstrate that there is indeed a genuine issue of material fact, the nonmovant’s opposition must also include a statement of material facts to which it contends that there are genuine issues and which are “properly supported by specific reference to the record.”
 
 Id.
 
 Thus, the opposing party must make specific references to the record which establish a genuine issue of fact; the opposing party cannot expect the court to ferret through the record to find evidence favorable to his case.
 
 Stepanischen v. Merchants Despatch Transp. Corp.,
 
 722 F.2d 922, 930-31 (1st Cir.1983);
 
 Dominguez v. Eli Lilly and Co.,
 
 958 F.Supp. 721, 727 (D.P.R.1997),
 
 aff'd,
 
 141 F.3d 1149 (1st Cir.1998) (Table case).
 

 With these strictures in mind, the Court turns its attention to Plaintiffs’ opposition to the motion for summary judgment. Their opposition contains a statement of contested facts. Of these contested facts, numbers 4, 8, and 13 admit certain allegations in Forest’s statement of facts. Only Plaintiffs’ numbers 1, 2, 4, 6, and 10 contain citations to the record. The remaining contested facts — numbers 3, 5, 7, 9, 11, and 12 — suffer from defects. They either make allegations of fact without citation to evidence, refer only to Plaintiffs’ memorandum of law for support, or merely deny Forest’s statement of fact based on a lack of information to form an opinion or belief. A party opposing summary judgment may not rely on unsubstantiated denials or conclusory allegations.
 
 Magee v. United States,
 
 121 F.3d 1, 3 (1st Cir.1997). Nor can a party stop summary judgment merely by insisting that the other side’s evidence should not be believed.
 
 Abbott v. Bragdon,
 
 107 F.3d 934, 942 (1st Cir.1997),
 
 vacated on other grounds,
 
 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Moreover, the allegations or arguments of counsel are not competent to oppose summary judgment.
 
 Nieves v. University of Puerto Rico,
 
 7 F.3d 270, 276 n. 9 (1st Cir.1993);
 
 Lopez v. Corporacion Azucarera de Puerto Rico,
 
 938 F.2d 1510, 1515-16 n. 11 (1st Cir.1991). These defects in Plaintiffs’ statement of contested facts have the effect of admitting as true a number of the assertions in Forest’s statement of facts. Therefore, the only statements of facts by Plaintiffs which the Court will consider are numbers 1, 2, 4, 6, 8,10, and 13.
 

 Having laid out this groundwork, the Court proceeds to a review of the record. From 1981 to 1997, Forest owned and operated Sein Mendez Laboratories as a manufacturing facility.
 
 [4]
 
 This facility was not a profitable one; it had been losing money for most or all of the ten years leading up to 1996.
 
 [5]
 
 Accordingly, Forest decided in 1996 to sell Sein Mendez. As part of this decision, it began negotiations in October 1996 with Francisco Santos and Velázquez to sell them the facility. At the time, Santos was Sein Mendez’ senior manager, and Velazquez was its control
 
 *164
 
 ler.
 
 [6]
 
 The price for the facility was to be $2,000,000. The transaction was tentatively structured so that Santos and Velázquez would pay $500,000 at the closing and then repay the balance of $1,500,000 over ten years.
 
 [7]
 
 Thus, Forest would in effect be financing the purchase of the plant.
 

 Shortly after negotiations began, Santos and Velázquez brought the other Plaintiffs into the group to facilitate the raising of the $500,000 for the down payment.
 
 [8]
 
 Plaintiffs then began to visit government agencies and banks in order to obtain financing for the down payment and permits for operating the plant.
 
 [9]
 
 Plaintiffs and Forest continued to engage in discussions, and a draft agreement was prepared. However, by the end of February 1997, a final agreement had not been reached by the parties.
 
 [10]
 

 In February, Santos withdrew from the group of potential purchasers.
 
 [11]
 
 He informed Forest that he dropped out because he was concerned with the financial viability of Sein Mendez operations and because he did not want to risk his own personal assets in the purchase and operation of the plant. Forest had considered Santos to be a key participant in this group of potential buyers because he was knowledgeable on Sein Mendez’ operations and because he was the member of the group with the most financial resources.
 
 [12]
 
 Forest did not, however, have any objection to proceeding to deal with this group which was now being headed up by Ve-lázquez.
 
 [13]
 
 Forest did inform Velázquez that it would consider selling Sein Mendez to him and his group provided that they could demonstrate that their operation would be profitable and would generate sufficient income to pay off the balance of the purchase price.
 
 [14]
 
 Velázquez asked Forest to reduce the required up-front payment from $500,000 to $250,000, but Forest did not agree to this request.
 
 [15]
 
 In a letter dated March 14, 1997, Velázquez wrote to Kenneth Goodman, Forest’s vice president of finance, informing him that his group had raised $300,000, but that they would need an extension of time to be able to successfully close negotiations.
 
 [16]
 
 Plaintiffs and Forest, however, had not reached a final agreement on all terms and conditions of a possible sale.
 
 [17]
 

 After Santos withdrew from Plaintiffs’ group, Forest began to discuss the sale of Sein Mendez with other parties. By April 1997, Forest was negotiating with Saleh Yassin of Creative Medical Corporation.
 
 [18]
 
 Forest had not agreed to refrain from negotiating with other parties.
 
 [19]
 
 Plaintiffs were aware that they were not the only potential buyers of Sein Mendez.
 
 [20]
 
 Forest had never provided Plaintiffs with a first
 
 *165
 
 option, exclusive right, or right of first refusal to purchase Sein Mendez.
 
 [21]
 

 In their statement of fact number 12, Plaintiffs contest Forest’s assertion that it never gave Plaintiffs a first option, exclusive right, or right of first refusal to purchase. Plaintiffs’ statement of facts, however, cites to no evidence on this issue; it states only, “See Memorandum of Law submitted by plaintiffs.” As discussed above, such allegations or arguments by counsel are not sufficient, by themselves, to defeat summary judgment.
 
 Nieves,
 
 7 F.3d at 276 n. 9;
 
 Lopez,
 
 938 F.2d at 1515-16 n. 11. Moreover, Plaintiffs’ allegation on this issue in their statement of íáct is belied by the record. Velázquez, Carlos Matías, and Rafael Rodriguez admitted in their depositions that no one at Forest ever stated that Plaintiffs had any exclusive or first right to purchase Sein Mendez.
 
 [22]
 
 Moreover, all Plaintiffs in their response to Forest’s requests for admissions admitted that there were no written documents or oral statements from Forest providing Plaintiffs with a first option, exclusive right, or right of first refusal.
 
 [23]
 

 In a letter of March 14, 1997, to Kenneth Goodman, Velázquez confirms a telephone conversation he had with Goodman and states that during the conversation it was discussed that “we continue to have the first option to buy Sein Mendez.”
 
 [24]
 
 In his deposition, however, Velázquez admitted that these were his words, not Goodman’s, and that Goodman did not tell him they had the first option.
 
 [25]
 
 Because of this admission in his testimony and because of the Plaintiffs’ responses to Forest’s request for admissions, the Court concludes that this letter is not sufficient to create a genuine issue as to whether Forest gave Plaintiffs a first option to purchase Sein Mendez.
 

 Thus, there were other parties negotiating with Forest to buy Sein Mendez and Plaintiffs were aware of this competition. While Forest and Plaintiffs never reached a final agreement, Forest’s negotiations with Yassin and Creative Medical Corp. had a different outcome. Creative Medical agreed to pay $1,875,000 for Sein Mendez. Unlike the proposed deal with Plaintiffs, however, the entire purchase price was to be paid at the closing. Forest would not be financing the transaction and therefore would not have to concern itself with the ongoing profitability of the facility.
 
 [26]
 
 While these negotiations with Creative Medical were being concluded, Plaintiffs were obtaining the financing for the $500,-000 down payment that they intended to use for what they thought would be their purchase of Sein Mendez.
 
 [27]
 
 In a letter dated April 27, 1997, Velazquez informed Goodman that Plaintiffs had accepted the sales offer, were ready to settle, and wished to meet “to discuss and finalize several items of the negotiations,”
 
 [28]
 
 Within a day or two, Rita Weinberger, Forest’s director of the corporate audit department, informed Velázquez that Forest was going to accept Creative Medical’s offer. She did tell him that the deal with Creative Medical had not been finalized and that there was thus still a possibility that Forest would sell Sein Mendez to Plaintiffs. On May 8, 1997, Forest and Creative Medical executed a purchase agreement for the sale of Sein Mendez.
 
 [29]
 

 
 *166
 
 Plaintiffs claim that Forest had allowed them until May 15, 1997, to obtain the necessary financing. Their support for this claim comes from two items in the record. One is Velázquez’ affidavit in which he avers that “[A]t my request, Defendant extended the deadline until May 15, 1997. That at all times such deadline was essential and plaintiffs rely [sic] on such date.” He also states that “[S]uch deadline (May 15, 1997) was imposed by the defendant.”
 
 [30]
 
 His affidavit contains no further explanation on the scope or nature of the deadline. The other evidence in the record is a letter from Kenneth Goodman addressed “To Whom It May Concern.” The letter states that Forest is discussing the sale of Sein Mendez to Plaintiffs and that “It is Forest’s intention to extend a deadline of May 15, 1997, for the group to present their final proposal for the purchase of the business.”
 
 [31]
 

 Plaintiffs claim that Forest’s sale of Sein Mendez to Creative Medical constituted a breach of Forest’s duty to negotiate in good faith. In its motion for summary judgment, Forest argues that it never entered into an agreement with Plaintiffs to sell Sein Mendez to them; that Plaintiffs never had any exclusive or first rights to buy Sein Mendez; and that Forest did not act in bad faith in its negotiations. Forest further claims that if Plaintiffs’
 
 culpa in contrahendo
 
 claim is allowed to proceed, their damages should be limited to their reliance damages which amounted to only $2,000. Lastly, Forest argues that Ve-lázquez is precluded from bringing a claim because he signed a release relieving Forest of liability. Plaintiffs have opposed the motion for summary judgment. For the reasons set forth below, the Court grants the motion for summary judgment.
 

 DISCUSSION
 

 Summary judgment is appropriate if “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.”
 
 See
 
 Fed.R.Civ.P. 56(c). The party moving for summary, judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact.
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting any facts that demonstrate a genuine issue for trial. Fed.R.Civ.P. 56(e);
 
 LeBlanc,
 
 6 F.3d at 841. The nonmovant must do more than show “some metaphysical doubt as to the material facts.”
 
 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is genuine when, based on the evidence, a reasonable jury could return a verdict for the nonmoving party.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). “The mere existence of a scintilla of evidence in support of the plaintiffs position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.”
 
 Id.
 
 at 252, 106 S.Ct. at 2512.
 

 1. The culpa in contrahendo claim
 

 Plaintiffs claim that Forest negotiated with them in bad faith and that therefore it is liable to them under the
 
 culpa in contrahendo
 
 doctrine. This doctrine, which means “fault in negotiating,” has its origins in nineteenth century Germany.
 
 See generally
 
 Friedrich Kessler
 
 &
 
 Edith Fine,
 
 Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study,
 
 77 Harv.L.Rev. 401, 401-04 (1964);
 
 Whirlpool Corp. v. U.M.C.O. Int’l Corp.,
 
 748 F.Supp. 1557, 1562-63 (S.D.Fla.1990). Generally, it is used to compensate a party for the expenses it incurred in reliance on the other party’s offer to form a contract when the contract negotiations break down.
 
 Snyder
 
 
 *167
 

 v. Champion Realty Corp.,
 
 631 F.2d 1253, 1255-56 (5th Cir.1980). In Puerto Rico, a
 
 culpa in contrahendo
 
 cause of action is derived from Article 1802 of the Civil Code.
 
 Torres v. Gracia,
 
 119 D.P.R. 698, 703, 1987 WL 448259 (1987) 19 Official Translations 742, 746-47 (1987);
 
 Produc-ciones Tommy Muniz, Inc. v. COPAN,
 
 113 D.P.R. 517, 528, 1982 WL 210537, 13 Official Translations 664, 677 (1982). In
 
 Tommy Muniz,
 
 the Puerto Rico Supreme Court recognized that a party is not obligated to enter into a contract, but rather it is free to withdraw from negotiations. 113 D.P.R. at 526, 13 Official Translations at 676. This breaking off of negotiations is not sufficient in and of itself to create liability.
 
 Id.
 
 at 530, 13 Official Translations at 680.
 

 The fact that two negotiating parties failed to come to a final agreement does not mean that the withdrawing party is automatically free from liability. Once a party enters into contract negotiations, it has a duty to act in good faith towards the other side.
 
 Borg Warner Int’l Corp. v. Quasar Co.
 
 95 J.T.S. 30, 723 n. 9 (1995);
 
 Tommy Muniz,
 
 113 D.P.R. at 526-27, 13 Official Translations at 676;
 
 Euromotion, Inc. v. BMW of North America, Inc.,
 
 136 F.3d 866, 871-72 (1st Cir.1998);
 
 Prime Retail, L.P. v. Caribbean Airport Facilities, Inc.,
 
 975 F.Supp. 148, 152 (D.P.R. 1997). A negotiating party may incur
 
 culpa in contrahendo
 
 liability if its conduct is wrongful, fraudulent, or dolose.
 
 Tommy Muniz,
 
 113 D.P.R. at 529, 13 Official Translations at 679. In determining whether a party is liable for its conduct during negotiations, the court should consider
 

 (1) the development of the negotiations, (2) how did they begin, (3) their course, (4) the conduct of the parties throughout them, (5) the stage at which the interruption took place, (6) the parties’ reasonable expectations to form a contract, as well as any other relevant circumstance under the facts of the ease.
 

 Torres,
 
 119 D.P.R. at 705, 19 Official Translations at 749 (quoting
 
 Tommy Mun-iz,
 
 113 D.P.R. at 530, 1982 WL 210537 13 Official Translations at 680);
 
 Euromotion,
 
 136 F.3d at 871 n. 2. This doctrine should be applied restrictively.
 
 Torres,
 
 119 D.P.R. at 710, 19 Official Translations at 754. Examples of liability-creating conduct would include a party’s failure to disclose its lack of legal capacity to enter into a contract; a party’s negotiating without any intent of entering into a contract but with the intent of obtaining confidential business information from the other side; a party’s using the negotiations not in order to finalize an agreement but to obtain some advantage in its dealings with a third party; or a party’s fault causing the business transaction to be ineffective.
 
 Tommy Muniz,
 
 113 D.P.R. at 529, 13 Official Translations at 679.
 

 In the case before the Court, the negotiations between Forest and Plaintiffs were begun in October 1996 and were ongoing up through the end of April. Despite the length of time that the parties had been discussing the possible sale, there is no evidence that a final agreement had been reached. In fact, the record indicates the opposite' — that there were still points that the parties needed
 
 to
 
 resolve.
 
 [32]
 
 Plaintiffs had received approval for their requested financing and thus would have been able to provide the $500,-000 required for the down payment. There is no evidence, however, that Forest and Plaintiffs ever reached an agreement on the business plan that Plaintiffs were proposing for the operation of Sein Mendez. Given that the balance of the purchase price was to be paid after Plaintiffs took over the managing of Sein Mendez and that, presumably, this balance would be paid off with earnings from the business, the exact nature of Plaintiffs’ busi
 
 *168
 
 ness plan was a significant part of the negotiations. Although the parties had been negotiating for approximately six months, the evidence in the record indicates that this major issue was still left to be resolved. Thus, with regard to the course and development of the negotiations, the record indicates that they were still far from complete.
 

 Plaintiffs claim that they expected to be the buyers of Sein Mendez. The record indicates that Forest was considering offers from other parties and that Plaintiffs were aware that they had competition. Additionally, Plaintiffs have-'admitted that they had no first option, exclusive right, or right of first refusal to purchase Sein Mendez.
 
 [33]
 
 Moreover, as discussed above, Plaintiffs had not yet finalized the terms of the purchase agreement with Forest. Thus, although they may have had expectations to be the buyers of Sein Mendez, it is not clear that these were reasonable expectations.
 

 Forest’s conduct might give rise to liability if it failed to inform Plaintiffs of its lack of legal capacity to enter into a contract; if it negotiated without any intent of entering into a contract with Plaintiffs, but only with the intent of obtaining confidential business information from them; or if it used the negotiations not to finalize an agreement with Plaintiffs, but rather to obtain an advantage in its dealings with a third party.
 
 See Tommy Muniz,
 
 113 D.P.R. at 529, 13 Official Translations at 679. Here the record contains no indication that Forest engaged in such conduct. There is no evidence that it obtained any advantage through its discussions with Plaintiffs, with Creative Medical, or with any other third party. Nor does the record indicate that Forest ever negotiated with Plaintiffs once it knew that it would be selling Sein Mendez to Creative Medical. From the record it appears that Forest began negotiating with Creative Medical while discussions with Plaintiffs were ongoing and that the negotiations with Creative Medical came to fruition before the discussions with Plaintiffs could be finalized. There is no evidence that Forest engaged in deceptive or fraudulent behavior in its negotiations with Plaintiffs.
 

 Culpa in contrahendo
 
 liability may exist if the failure of the transaction is due to some fault or bad faith on the part of the party that withdrew from the negotiations.
 
 Id.
 
 A party may be subject to liability if its withdrawal was arbitrary or unjustified.
 
 Id.
 
 at 529, 13 Official Translations at 678-79 (quoting B. Moreno Quesada,
 
 La Oferta de Contrato
 
 45-46 (1963)). In the present case, it is undisputed that Forest was confronted with two potential buyers;' Plaintiffs and Creative Medical. The sale to Creative Medical was for $1.875 million, which was paid at the closing. A sale to Plaintiffs would have netted Forest, by contrast, only $500,000 at the closing. Forest would then have had to finance the remaining $1.5 million over ten years. It is also undisputed that Sein Mendez had not been a money-making operation in recent years. Thus, the prospect of extending $1.5 million in credit to Plaintiffs was far from a risk-free proposition. Courts have held that a party’s economic ability to finance a project — or lack thereof — is a legitimate factor to consider in determining whether a refusal to deal with that party is justified.
 
 See Torres,
 
 119 D.P.R. at 707, 19 Official Translations at 751;
 
 Vila & Hnos., Inc. v. Owens Illinois de P.R.,
 
 117 D.P.R. 825, 836 n. 15, 1986 WL 376750, 17 Official Translations 987, 1001 n. 15 (1986). The
 
 culpa in contrahendo
 
 doctrine does not oblige a seller to forego a more lucrative offer from party B merely because party A had been negotiating with it first. Rather, the doctrine compels the seller to negotiate in good faith with both parties A and B. In the present case Forest accepted an offer from Creative Medi
 
 *169
 
 cal that was certainly less risky and probably more lucrative than the tentative terms of sale to Plaintiffs.
 
 [34]
 
 There is no evidence that Forest acted in bad faith by choosing not to sell Sein Mendez to Plaintiffs.
 

 There is evidence in the record of a May 15, 1997, “deadline” that Forest had extended to Plaintiffs in the parties’ negotiations.
 
 [35]
 
 Plaintiffs make much of this deadline and the fact that Forest sold Sein Mendez to Creative Medical before the deadline had expired. While there is evidence of a deadline, the record is devoid of any indication of its significance. It is not clear what this was a deadline for. Plaintiffs have admitted that they did not have a first option, exclusive right, or right of first refusal to purchase Sein Mendez.
 
 [36]
 
 Therefore, this deadline could not have been for a term during which Forest would only consider selling to Plaintiffs. In fact, it is undisputed that Forest wTas discussing the sale to other parties before May 15, 1997. There is no evidence that this deadline was indicative of a term during which Forest committed itself to considering only Plaintiffs’ offer. While there may have been a deadline, its significance and any constraints it put on the parties is unclear. It does not seem likely that this deadline indicated that Forest was obliged to deal only with Plaintiffs in the period leading up to May 15, 1997. Rather, it seems more likely that May 15, 1997, was the last date when Forest would consider selling to Plaintiffs.
 

 The imposition of
 
 culpa in contrahendo
 
 liability must be done so restrictively.
 
 Torres,
 
 119 D.P.R. at 710, 19 Official Translations at 754. In the present case, Forest engaged in negotiations with Plaintiffs for the sale of Sein Mendez, and the parties had reached a tentative, but not final, structuring of a sale. These tentative terms provided that Forest would finance three-fourths of the purchase price. Forest was thus assuming a risk — the risk of default. Given that Sein Mendez had not been profitable in recent years, this was a not insignificant risk. Plaintiffs did not, however, have an exclusive or first right to purchase Sein Mendez, and Forest entered into negotiations with a third party. This party ultimately offered to pay the entire purchase price up front. These terms were certainly more favorable to Forest than the ones proposed by Plaintiffs. Forest’s decision to sell to this third party thus was not arbitrary or unjustified. There is no indication that during the discussions, Forest deceived Plaintiffs, obtained some unfair advantage from the negotiations, or otherwise acted in bad faith. There is no genuine issue of fact to support the
 
 culpa in contrahendo
 
 claim. Accordingly, the Court must grant summary judgment on this issue.
 
 [37]
 

 
 *170
 

 2. Velázquez’ release
 

 There is an alternative ground for dismissing the claims of Velázquez. As part of Forest’s extrication from its Sein Mendez operations, it entered into severance agreements with a number of the facility’s employees. Velázquez was one of these employees. As part of his agreement he received $100,000 in severance pay.
 
 [38]
 
 In consideration, Velázquez executed a general release. In paragraph
 
 2
 
 of the release he agreed that he and his spouse
 

 do not have, and if they had will not pursue, before any federal, state or Puerto Rico court or administrative agency,
 
 any claim of any nature whatsoever,
 
 including
 
 but not limited to
 
 those related with, or that can be alleged to have occurred from the employment relationship with Forest, or the termination of this relationship, and
 
 execute the most complete release for any claim or cause of action which they have or may have had
 
 or could have had, whether at law or in equity, in contract, damages, against Forest....
 
 [39]
 

 Elsewhere the release states as follows:
 

 3. Forest, the Corporations and their Representatives are released and forever exonerated of
 
 all claims,
 
 allegations, actions, causes of action and/or Amended Complaints at law or in equity, for
 
 any concept
 
 that Velázquez may have or could have had against any of them.
 

 ^
 
 %
 
 * * # Jfc
 

 13. The parties agree that they have executed this document freely, voluntarily and without any coercion or intimidation of any kind whatsoever, and that it is the complete agreement between them and that no representation other than those herein stated have been made.
 
 [40]
 

 The release was executed on May 27,1997, after Plaintiffs had unsuccessfully attempted to purchase Sein Mendez and after Forest had sold Sein Mendez to Creative Medical.
 
 [41]
 
 Velázquez consulted with an attorney before signing this release.
 
 [42]
 
 In his affidavit submitted with Plaintiffs’ opposition to the motion for summary judgment, he claims that he intended that the release only relieve Forest of liability for claims arising out of his employment at Sein Mendez
 
 [43]
 

 Under the Puerto Rico Civil Code, the court should enforce the literal meaning of a contract whose terms are clear. P.R.Laws Ann. tit. 31, § 3471 (1991);
 
 Unisys v. Ramallo Brothers,
 
 128 D.P.R. 842, 852, 1991 WL 735351 (1991). When the agreement is clear and unambiguous, the court should ignore parole evidence and should enforce the terms of the contract.
 
 Marina Indus., Inc. v. Brown Boveri Corp.,
 
 114 D.P.R. 64, 72, 1983 WL 204219, 14 Official Translations 86, 97-98 (1983);
 
 Borschow Hosp. & Medical Supplies, Inc. v. Cesar Castillo, Inc.,
 
 96 F.3d 10, 15-16 (1st Cir.1996). This is especially true when an unambiguous contract has a provision stating that the contract constitutes the entire agreement between the parties.
 
 See Borschow Hosp.,
 
 96 F.3d at 16. The court may consider extrinsic evidence only if the relevant terms of a contract are unclear.
 
 Executive Leasing v. Banco. Popular de Puerto Rico,
 
 48 F.3d 66, 69 (1st Cir.1995).
 

 In the case before the Court, Velázquez’ release clearly provides that he relieves Forest of all liability for “any claim of any nature whatsoever” and that the agreement constitutes “the most com-
 
 *171
 
 píete release for any claim or cause of action” which he may have. The release also contains an integration clause stating that the agreement with Forest “is the complete agreement between them” and that there is no other representation other than those contained in the release. This broad language does not bode well for any claim that Velázquez now may seek to bring against Forest. Furthermore, in their opposition, Plaintiffs do not point to any ambiguity in the release that would allow the Court to consider extrinsic evidence regarding Velázquez’ intent when he signed the agreement. Moreover, Ve-lázquez held the position of controller at Sein Mendez and was the leader of Plaintiffs’ group in their attempt to purchase the company. Thus, he cannot claim to be an unsophisticated person unaware of what he was signing. At any rate, he had the benefit of advice from counsel prior to signing the agreement. Because the general release executed by Velázquez contains broad and clear language relieving Forest of liability and because Plaintiffs fail to point to any ambiguity in the release, the Court may not consider extrinsic evidence in interpreting the release. Its terms, therefore, must be enforced. Ve-lázquez, thus, may not bring this claim against Forest. The Court grants summary judgment on this alternative ground as well.
 
 [44]
 

 WHEREFORE, the Court hereby grants Forest’s motion for summary judgment (docket no. 48). Judgment shall be entered accordingly dismissing this case with prejudice.
 

 IT IS SO ORDERED.
 

 [1]
 

 . The spouses and conjugal partnerships of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodriguez Rivera are also plaintiffs. In the interest of conciseness, the Court will use "Plaintiffs” to refer to the former Sein Mendez employees. The Court addresses the claims of the spouses and conjugal partnerships in footnote 37 below of this opinion and order.
 

 [2]
 

 . In its motion for summary judgment, Forest addresses what it considers to be a claim by Plaintiffs for breach of contract. Plaintiffs’ amended complaint, however, does not make reference to such a theory of liability, and their opposition to the motion for summary judgment is similarly bereft of any indication that they are claiming a breach of contract. Thus, the Court treats Plaintiffs' cause of action. as one solely under the
 
 culpa in contra-hendo
 
 doctrine.
 

 [3]
 

 . 28 U.S.C.A. § 1332 (West 1993 & Supp. 1999).
 

 [4]
 

 . Docket no. 48, Affidavit of Kenneth Goodman (hereinafter "Goodman Affidavit”), at 3.
 

 [5]
 

 . Docket no. 48, Goodman Affidavit, at 3; exhibit C; exhibit DD, at 11.
 

 [6]
 

 . Docket no. 48, Goodman Affidavit, at 3-4; docket no. 51, Affidavit of Domingo Velázquez (hereinafter "Velázquez Affidavit”).
 

 [7]
 

 . Docket no 48, Goodman Affidavit, at 4; docket no. 51, Velázquez Affidavit.
 

 [8]
 

 . Docket no. 48, Goodman Affidavit, at 5-6; docket no. 51, Velázquez Affidavit.
 

 [9]
 

 . Docket no. 51, Velázquez Affidavit; exhibits A-G, I-L, N, Q, & S-V.
 

 [10]
 

 . Docket no. 48, Goodman Affidavit, at 6-7; exhibit D.
 

 [11]
 

 . Docket no. 48, Goodman Affidavit, at 7; docket no. 51, Velázquez Affidavit.
 

 [12]
 

 . Docket no. 48, Goodman Affidavit, at 7; exhibit DD, at 36-37.
 

 [13]
 

 . Docket no. 51, Velázquez Affidavit.
 

 [14]
 

 . Docket no. 48, Goodman Affidavit, at 8.
 

 [15]
 

 . Docket no. 48, Goodman Affidavit, at 7-8 n. 5; docket no. 51, exhibit P.
 

 [16]
 

 . Docket no. 51, exhibit P.
 

 [17]
 

 . Docket no. 48, exhibits MM, NN, 00, PP, QQ, & RR.
 

 [18]
 

 . Docket no. 48, Goodman Affidavit, at 9-10.
 

 [19]
 

 . Docket no. 48, Goodman Affidavit, at 8-9; exhibit FF, at 49.
 

 [20]
 

 . Docket no. 48, exhibit DD, at 64 — 65; exhibit HH, at 56-58, 68-69; & exhibit II, at 9-11.
 

 [21]
 

 . Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; exhibit KK, at 19; exhibits MM, NN, OO, PP, QQ, RR.
 

 [22]
 

 . Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; & exhibit KK, at 19.
 

 [23]
 

 . Docket no. 48, exhibits MM, NN, OO, PP, QQ, & RR.
 

 [24]
 

 . Docket no. 51, exhibit P.
 

 [25]
 

 . Docket, no. 48, exhibit DD, at 68-69.
 

 [26]
 

 . Docket no. 48, Goodman Affidavit, at 11.
 

 [27]
 

 . Docket no. 51, exhibits B & J.
 

 [28]
 

 . Docket no. 51, exhibit H.
 

 [29]
 

 . Docket no. 48, Goodman Affidavit, at 11-12; exhibit K; exhibit DD, at 77-79.
 

 [30]
 

 . Docket no. 51, Velázquez Affidavit.
 

 [31]
 

 . Docket no. 48, exhibit F.
 

 [32]
 

 . Docket no. 48, Goodman Affidavit, at. 6-7; exhibits MM, NN, OO, PP, QQ, & RR; docket no. 51, exhibit H.
 

 [33]
 

 . Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; exhibit KK, at 19; exhibits MM, NN, OO, PP, QQ, & RR.
 

 [34]
 

 . The proposed financing by Forest of the $1.5 million balance of the purchase price was to be over a period of ten years. The exact terms of this financing were never finalized, and it is thus not possible to determine with precision whether the sale to Plaintiffs would have been more or less lucrative for Forest than the sale to Creative Medical. Because Creative paid the entire $1,875 million price up front, it seems highly probable that the present value of this amount would exceed the present value of the amount that Forest would have received from Plaintiffs over the course of the ten years of financing.
 

 [35]
 

 . Docket no. 48, exhibit F; docket no. 51, Velázquez Affidavit.
 

 [36]
 

 . Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; exhibit KK, at 19; exhibits MM, NN, OO, PP, QQ, & RR.
 

 [37]
 

 . The spouses and conjugal partnerships of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodriguez Rivera are also plaintiffs. The claims of these plaintiffs are derivative of the
 
 culpa in contrahendo
 
 claims of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodriguez Rivera. Thus, they too must be dismissed. Even if the Court had denied the motion for summary judgment on the
 
 culpa in contrahen-do
 
 claims, these derivative claims would have been dismissed.
 
 See Satellite Broadcasting Cable, Inc. v. Telefonica da España,
 
 786 F.Supp. 1089, 1096 (D.P.R.1992) (In
 
 culpa in contrahendo
 
 claim, no cause of action exists for parties not participants in the negotiations).
 

 [38]
 

 . Docket no. 48, Goodman Affidavit, at 13; exhibits L & M.
 

 [39]
 

 . Docket no. 48, exhibit M (emphasis added).
 

 [40]
 

 . Docket no. 48, exhibit M (emphasis added).
 

 [41]
 

 . Docket no. 48, exhibit M.
 

 [42]
 

 . Docket no. 48, exhibit DD, at 92.
 

 [43]
 

 . Docket no. 51, Velázquez Affidavit.
 

 [44]
 

 . Because the Court grants Forest’s motion for summary judgment for the reasons discussed in this opinion and order, it is unnec-essaiy for the Court to consider Forest’s additional argument that the maximum amount of damages that Plaintiffs can claim is $2,000.