# United States Court of Appeals
## For the First Circuit

No. 02-1625

YSIEM CORPORATION,

Plaintiff, Appellant,

v.

COMMERCIAL NET LEASE REALTY, INC.,

Defendant, Appellee.

_____

OFFICEMAX, INC.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, <u>U.S. District Judge</u>]

Before

Boudin, <u>Chief Judge</u>,

Selya and Lipez, <u>Circuit Judges</u>.

<u>Eugenio C. Romero</u> with whom <u>Eugenio C. Romero Law Offices</u> was on brief for appellant.
<u>Verónica Ferraiuoli-Hornedo</u> with whom <u>Néstor Durán</u> and <u>McConnell Valdés</u> were on brief for appellee.

May 1, 2003

**BOUDIN**, <u>Chief Judge</u>.  Ysiem Corporation ("Ysiem") is a Puerto Rico corporation that owns a parcel of land in Rio Piedras, Puerto Rico.  In late 1997, Ysiem inquired through a broker whether the office supply chain OfficeMax would be interested in building a store on a portion of the site.  OfficeMax replied that it does not acquire or develop property itself; it will only lease (or sublease) sites that are fully developed.  The broker put Ysiem in contact with Commercial Net Lease Realty, Inc. ("Commercial Net"), a company that develops commercial properties that are then leased to major retail businesses under long-term leases.  Commercial Net had developed sites for OfficeMax in the past.

Commercial Net and Ysiem began to negotiate a ground lease agreement in February 1998.  During these negotiations, Commercial Net had no assurance from OfficeMax that the latter would be interested in subleasing the site from Commercial Net: OfficeMax usually does not negotiate with the developer at all until it has received a pro forma budget, for the developer will ordinarily first need at least a tentative agreement with the landowner as to the ground rent.

Representatives from Ysiem and Commercial Net met in March 1998.  Ysiem understood that Commercial Net hoped to lease the land from Ysiem and build a retail store to OfficeMax specifications that OfficeMax would then sublease from Commercial Net.  On March 26, 1998, Commercial Net and Ysiem signed a letter

of intent specifying the lease term, annual ground rent, and other contemplated provisions including a statement that the effective date of the ground lease would be the date that OfficeMax opened its doors or six months after the start of construction, whichever came later. The letter also stated: "The parties shall enter into negotiations for the completion of documentation incorporating the above. This transaction shall not be binding until final execution and delivery of such mutually agreeable documentation."

After signing the letter of intent, Commercial Net and Ysiem began to negotiate the ground lease agreement and, in May 1998, the parties settled upon final language incorporating many of the terms laid out in the letter of intent. But unlike the deferred effective date for the lease contemplated in the letter of intent, the ground lease stated (conventionally) that the lease was "made, entered into and effective as of" a specific date--which was left blank in the draft. Section 7.6 of the ground lease gave Commercial Net the right to terminate the agreement if it was not able to enter into a sublease agreement with OfficeMax within 60 days:

> Within sixty (60) days of the Effective Date, Tenant shall have obtained a sublease with OfficeMax, Inc., an Ohio corporation ("OfficeMax"), in a form satisfactory to Tenant in its sole and absolute discretion. If Tenant does not obtain the sublease within such 60-day period, Tenant, at Tenant's option, by written notice to Landlord within five (5) days after the expiration of such 60-day period, may terminate this Lease. If

> Tenant does not give the aforesaid notice to Landlord prior to the expiration of the applicable 5-day period, Tenant shall be deemed to have waived this condition. If Tenant terminates this Lease under this Section 7.6, this Lease shall become null and void, and neither party shall have any further obligations hereunder.

On May 6, 1998, Commercial Net sent Ysiem four copies of the ground lease agreement for execution. The accompanying letter instructed Ysiem's representative to execute the four copies and return them to Commercial Net for Commercial Net's execution. Ysiem signed the copies, leaving the execution date blank, and returned them to Commercial Net on May 12. In early June, Commercial Net asked Ysiem for a resolution from Ysiem's board of directors stating that the Ysiem employee who had signed the ground lease had authority to do so; Commercial Net said this was necessary for the ground lease "to be effective and binding against the landlord and in order to record the Lease." Ysiem's board quickly passed this resolution.

Commercial Net did not execute the lease after it received notice of this resolution; instead it began negotiating the sublease agreement with OfficeMax. At the end of June, Commercial Net submitted to OfficeMax a pro forma budget stating that OfficeMax's rent would be $23.09 per square foot. OfficeMax said this figure was too high, so Commercial Net asked Ysiem for a reduction in the rent, explaining OfficeMax's position. Ysiem refused. Commercial Net attempted to salvage the deal by lowering

-4-

its own return rate and reducing the annual rent increases, thereby reducing OfficeMax's annual rent to $22.42 per square foot. OfficeMax still found the rent too high.

Ysiem's own broker then sent a letter to an OfficeMax representative justifying the ground lease rent as comparable to other rents in the area. Mentioning various possible tenants, the letter also said that Ysiem had instructed the broker for the property to find an alternate lessee but to hold off doing so until Ysiem reached a final resolution with Commercial Net and OfficeMax. In late July 1998, Commercial Net made one last effort to make a deal with OfficeMax, which the latter rejected because it still found the rent too high.

At the end of August, Ysiem requested from Commercial Net an executed copy of the ground lease. Ysiem's letter, plainly a predicate to litigation, stated that "[a]lthough such formal requirement is not strictly necessary under Puerto Rico contract law, it would seem compelling to have an original copy of the Agreement available in our files." The letter ended by noting, "[i]n view of the foregoing, we hereby reiterate YSIEM's emphatic position that the Ground Lease Agreement is a valid, effective, and enforceable contract with [Commercial Net]." Commercial Net responded that there was no contract because Commercial Net had never executed the ground lease agreement. It also returned the original four copies without its own signature.

Ysiem filed this diversity action against Commercial Net and OfficeMax in federal district court in Puerto Rico in December 1998, seeking specific performance or damages. Ysiem alleged that the defendants had breached the ground lease agreement and that their actions had been wrongful. After discovery, Ysiem voluntarily dismissed the claims against OfficeMax. The remaining parties then cross-moved for summary judgment. After receiving a recommendation from the magistrate judge, the district court dismissed the remaining claims, and Ysiem has appealed. We review a grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party. Motorsport Eng'g, Inc. v. Maserati S.p.A., 316 F.3d 26, 28 (1st Cir. 2002).

The district court gave two bases for rejecting Ysiem's contract claim that the ground lease between it and Commercial Net is binding. Its first reason was that the ground lease agreement was not binding because Commercial Net never signed a sublease agreement with OfficeMax. The court stated that OfficeMax was "the linchpin of the proposed transaction" and "without OfficeMax's execution and sub-lease documentation, the proposed transaction was not binding." This effectively reads the final version as if it retained the effective date language proposed in the letter of intent.

Under this line of reasoning, the ground lease agreement would not be an enforceable contract at the outset even if both

parties had signed and dated the final copies unless and until OfficeMax executed a sublease. Yet this would be contrary to the explicit effective date language in the final version of the ground lease agreement, and it would make redundant the 60-day back-out clause quoted above. To us, the change from the letter of intent language to the final ground lease language was self-evidently meant to give Ysiem a measure of limited protection once the ground lease agreement was executed by both sides.

The district court's second reason was that the ground lease agreement never became an enforceable contract because it was never executed by Commercial Net. Ysiem answers that under Puerto Rico law an agreement can be binding without executed documentation if, inter alia, the parties have a "meeting of the minds expressed through the offer and the acceptance."[1] There is nothing wrong with this abstract proposition; and (statute of frauds or like requirements aside) the proposition might apply if the parties had merely agreed to a set of final terms without any understanding that executed documentation was essential to the formation of the ground lease agreement. See Consarc Corp., 996 F.2d at 570.

However, in the present case, the framework for the negotiations was created by the letter of intent which specified

---

[1]Producciones Tommy Muniz, Inc. v. Comite Organizador de los VIII Juegos Panamericanos, 13 P.R. Offic. Trans. 666, 670 (1982); see also Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 570 (2d Cir. 1993).

that the negotiations were to be conducted for "the completion of documentation" and said that the transaction was not "binding"-- that is, did not create an effective contract--"until final execution and delivery of such mutually agreeable documentation." Although the parties were still free to alter the final terms and omit this requirement, the ground lease agreement itself explicitly provided that it would be effective only when executed, and, in context, this obviously means by both sides.

Ysiem has an alternative claim for relief that does not depend on the existence of a binding ground lease agreement. This argument rests on the civil law doctrine of culpa in contrahendo, which requires parties to negotiate in good faith. Kessler & Fine, Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study, 77 Harv. L. Rev. 401 (1964) The argument was not well-developed in the district court, but after reviewing the complaint and motion papers, we think the argument was just barely presented and preserved for this appeal, where somewhat more emphasis is placed upon it.

At common law, liability for bad faith bargaining, in the absence of a final contract, is fairly limited although claims based on fraud or estoppel are possible; and depending upon language and inclination, courts sometimes construe letters of intent as themselves creating a contractual or quasi-contractual obligation to negotiate in good faith toward a final contract.

See, e.g., Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 277-78 (7th Cir. 1996); Farnsworth, Contracts § 3.26 (2d ed. 2001). But the governing law in this case is that of Puerto Rico where the somewhat broader doctrine of culpa in contrahendo governs.[2]

Under this doctrine, negotiations toward an agreement can--even without a letter of intent--readily give rise to mutual expectations that the parties will bargain in good faith and refrain from misconduct. The doctrine looks to common law eyes closer to a tort than a contract claim and is designed primarily to protect reliance rather than expectation interests. Satellite Broad., 807 F. Supp. at 219-22. The culpa in contrahendo test is not very precise and the courts appear reasonably cautious in applying a doctrine that could, if applied too freely, chill negotiations rather than facilitate them. Satellite Broad., 807 F. Supp. at 222; Farnsworth, supra, § 3.26.

The leading case in Puerto Rico is the Tommy Muniz decision already cited. There, the plaintiff was the highest bidder to broadcast the Pan American games in Puerto Rico, and the committee awarding the contract told the plaintiff that its bid had

---

[2]See generally Tommy Muniz, 13 P.R. Offic. Trans. at 676; Torres v. Gracia, 19 P.R. Offic. Trans 742, 746-49 & n.2 (1987); Velazquez Casillas v. Forest Labs., Inc., 90 F. Supp. 2d 161, 166-70 (D.P.R. 2000); Prime Retail, L.P. v. Caribbean Airport Facilities, Inc., 975 F. Supp. 148, 151-53 (D.P.R. 1997); Satellite Broad. Cable, Inc. v. Telefonica de Espana, S.A., 807 F. Supp. 218 (D.P.R. 1992).

been accepted subject to negotiation of the detailed contract. Tommy Muniz, 13 P.R. Offic. Trans. at 666-67.  In the midst of negotiations, the committee decided to broadcast the games over government stations and ended its negotiations with the plaintiff. Id. at 668-69.  Holding that the committee had violated its duty of good faith, the court adopted a rather general test dependent upon the circumstances, including conduct, reasonable expectations and virtually any other relevant circumstance.  Id. at 680.

It is possible to criticize Commercial Net's action in sitting on the ground lease agreement signed by Ysiem instead of executing and returning the lease promptly or, in the alternative, saying forthrightly that it was not prepared to sign until its own negotiations with OfficeMax began to bear fruit.  On this record we cannot know whether this was a deliberate effort to mislead, or an oversight, or neither: obviously Ysiem knew that it had not received in return a signed copy of the lease.  How much scienter matters to culpa in contrahendo doctrine under Puerto Rico law is also unclear.

By contrast to the Tommy Muniz case, Commercial Net's delay in signing the ground lease was part of an effort to achieve a sublease with OfficeMax in the interest of both Commercial Net and Ysiem.  The negotiations with OfficeMax were protracted because of disagreement as to rent; Ysiem was aware of the problem and the delay: it itself urged OfficeMax to reconsider.  Accordingly, even

if Commercial Net were treated as modestly blameworthy, the fault was a limited one and occurred in the course of an effort to save the project as a whole.

In all events, Ysiem would not have been any better off if the ground lease agreement had been signed by Commercial Net and returned to Ysiem in early June. Had this occurred, Commercial Net--as the end of the 60-day period approached without a sublease from OfficeMax--would surely have exercised the option clause to terminate the agreement unless Ysiem extended the 60-day period. Ysiem, in failing to press for return of a signed copy more quickly, may well have understood the situation.

Affirmed.